Edward SHAPIRO, Plaintiff

v.

C. C. STAHL, t/a Valley Novelty Works,
Defendant.

Civ. A. No. 6805.

United States District Court
M. D. Pennsylvania.

July 26, 1961.

½

---

Laputka, Bayless, Ecker & Cohn, Hazle-
ton, Pa., for plaintiff.

Smith, Eves & Keller, Bloomsburg, Pa., for defendant.

FOLLMER, District Judge.

This is a suit for commissions on sales. The case was tried to the Court without a jury. On consideration of the pleadings and the testimony of the witnesses, and upon the entire record herein, the Court makes and files its Findings of Fact and Conclusions of Law as follows:

Findings of Fact

1. Plaintiff, Edward Shapiro, an individual, resides at 3026–90th Street, Jackson Heights, New York.

2. Defendant, Carroll C. Stahl, an individual, resides at Bloomsburg, Pennsylvania.

3. Defendant is a manufacturer of wooden toys and operates under the trade name or designation of Valley Novelty Works.

4. Sometime in 1957, about the month of August, plaintiff was approached by the principals of Playhouse Toys, Inc., a New York manufacturer and distributor of wooden toys, with the request that plaintiff, while in the course of his travels, be on the lookout for a source of manufacture of items sold by Playhouse Toys, Inc.

5. On or about September 11, 1957, plaintiff, while calling on another producer in Columbia County, Pennsylvania, visited with defendant relative to finding a customer outlet for defendant's productive facilities. On this occasion an agreement prepared by plaintiff was executed by the parties.

6. This agreement was based on a mutual understanding that defendant would make a ten per cent. profit on work for customers secured by plaintiff, over and above a five per cent. commission allowed by the agreement to plaintiff on said work.

7. Under the written terms of the agreement, plaintiff was (1) employed as a salesman and engineer by the defendant; (2) was to lend any and all assistance in the setting up of jobs, breakdown of costs, and procurement of raw materials and suppliers thereof; (3) for the performance of these duties, he was to receive a five per cent. commission on goods sold to customers procured by him.

8. The only engineering, production, or set up service at any time rendered by the plaintiff was to suggest stapling the metal bottoms of sandboxes rather than nailing them.

9. The only customer produced by the plaintiff for the defendant was Playhouse Toys, Inc., a concern which had previously requested the plaintiff to find a manufacturer for them.

10. All job costs or cost breakdowns for items purchased by Playhouse Toys, Inc., were prepared and furnished by its principals.

11. The only supplies and suppliers furnished or procured by the plaintiff were (1) a carload (2500 sets) of component parts for sandboxes from Arizona Molding Co., Snow Flake, Arizona (this company was also referred to in the testimony as Hunter); (2) nuts and bolts from Atlas Screw and Specialty Co., Inc., 450 Broome St., New York 13, New York; (3) a carload of redwood lumber for kiddie picnic tables from Seneca Distributors of New York.

12. The plaintiff had material for the sandboxes billed to Paralite Corporation, a company owned and operated by the plaintiff at $1.60 per set, less commission of five per cent. and discount of two per cent. The same was billed by Paralite Corporation to the defendant at $1.70 per set net.

13. The plaintiff acted in the capacity of salesman for Atlas Screw and Specialty Co., Inc., and received a salesman's commission on items sold and delivered to the defendant.

14. The plaintiff entered into a joint venture with Joseph Dickman, trading as Seneca Distributors, in the sale and delivery of the redwood lumber to the defendant.

15. The plaintiff assured the defendant that the type of redwood lumber sup-

plied was satisfactory for its intended use.

16. This material was manufactured into kiddie picnic tables and because of the wetness of the lumber, the cartons in which the same were packed became soggy, the tables became stained, and some 900 were returned to the defendant for reworking and repackaging.

17. In September of 1958, plaintiff came to the defendant's place of business accompanied by Mr. Septoff and Mr. Kaufman, principals of Playhouse Toys, Inc., and at a luncheon which all attended, plaintiff said to the defendant, "Forget about the whole deal. I am washing my hands of it. I am not going to be bothered with it any more." Mr. Stahl stated, "That is all right with me."

18. The plaintiff offered and performed no services of any nature or character whatsoever after September, 1958, to or for the defendant.

19. Defendant had no knowledge until after September, 1958, that the plaintiff was receiving commissions or profit-sharing on materials which he procured for the defendant.

20. Defendant had total gross sales from September 11, 1957, to October 27, 1959, date of institution of action, in the sum of $217,363.42
Less returns and allowances 2,042.31

Net sales $215,321.11

The above sales were made by periods as follows:

September 11, 1957, to and
including August 31, 1958 $64,235.25
September 1, 1958, to September 30, 1958 5,784.91
September 11, 1957 (date of agreement) to December 31, 1958 78,478.77

21. Total business through December 31, 1958, resulted in a net operating loss to defendant.

22. Business for the calendar year 1959, a period when the plaintiff was in no way associated with the defendant, resulted in a profit of $9,274.27, a profit of approximately five and one-half per cent. of net sales.

23. Profit, commission and discount to the plaintiff on the purchase and resale to the defendant of the component parts for sandboxes amounted to $477.70; commission on the purchases from Atlas Screw and Specialty Co., Inc., $120; and share of profit on the joint venture with Seneca Distributors, $200.

24. Additional expenses to the defendant for reworking and repackaging of the picnic tables manufactured from redwood lumber sold him by the plaintiff in conjunction with Seneca Distributors, and which the plaintiff had assured the defendant was satisfactory for the intended use, amounted to at least $898, calculated as follows:

Freight on 300 tables returned
and reshipped $556.00
Cartons for 900 tables, returned,
reworked and reshipped 270.00
A minimum 4½ days for 2 men
in reworking tables, calculated at minimum rate of $1.
per hour 72.00

$898.00

There was no testimony with respect to freight on other tables returned and reshipped, cost of setting up jiggs, cost of machine work, and cost of operating dry kiln.

## Discussion

The agreement of September 11, 1957, was written by plaintiff. The agreement provides for the employment of plaintiff by defendant as a solicitor of business and engineer "for any and all items that said frirm (sic) can make." In addition to bringing business to defendant, plaintiff was to "lend any and all assistance in setting up the jobs, break down the costs and secure raw material supplies and suppliers." For the above services plaintiff was to receive a commission of five per cent. on any and all business secured by plaintiff.

By way of performance under said agreement, plaintiff produced one cus-

tomer, Playhouse Toys, Inc. The sole and only engineering service rendered was to suggest stapling metal bottoms of sandboxes rather than nailing them. Plaintiff, on only three occasions, furnished or procured supplies or suppliers as follows:

1. Carload of 2500 sets of component parts for sandboxes which were billed to Paralite Corporation at $1.60 per set, less commission of five per cent. and discount of two per cent. Plaintiff billed same to defendant at $1.70 per set net.

2. Nuts and bolts from Atlas Screw and Specialty Co., Inc., for which plaintiff received from Atlas a commission of five per cent., which was not passed on to defendant.

3. Carload of redwood lumber for kiddie picnic tables from Seneca Distributors. Plaintiff dealt with Seneca in this matter as a "joint venture. We worked on what we call a 50-50 basis. We take the cost of the material, plus all expenses, and we divide the profit." Plaintiff indicated that on this deal his share of the profit of the sale to defendant was $200. There is no testimony that this profit was passed on to defendant.

■ As above indicated, this agreement was written by plaintiff and must be construed most strongly against him, 8 P.L.E. Contracts § 133.

■■ It is clear to me that at no time did plaintiff reveal to defendant that he was making secret profits on the merchandise that he procured for defendant. In so failing to make a complete disclosure to defendant he violated one of the most basic tenets in the law of Agency, to wit:

"The agent also holds a strict duty of good faith, and, apart from stipulated compensation, can rightfully earn no personal gain, profit or advantage from the execution of the agency, whether the same be gained from execution of the agency or in violation thereof." 1 P.L.E. Agency § 42.

Not only did plaintiff violate his trust obligation to defendant but he actually added an out-of-pocket cost to defendant to his (the plaintiff's) own personal financial gain.

■ The rule of duty is stated in Allegheny By-Product Coke Co. v. J. H. Hillman & Sons Co., 275 Pa. 191, 203, 118 A. 900, 904, as follows:

"The agent stands in the capacity of a fiduciary to his principal, and in all of the dealings he must serve his employer with the utmost good faith and loyalty. It is his duty to make known all matters affecting transactions which may be of importance to the one for whom he acts. * * *"

In Levin v. Sieff, 99 Pa.Super. 200, 203, the Court said: "No broker, agent or middleman can recover for services which uncover double dealing. Perfect good faith must appear in order that recovery may be had."

In Rice v. Davis, 136 Pa. 439, 442, 443, 20 A. 513, 514, the Court said:

"The principle, underlying this case, that an agent for the sale of property cannot at the same time act as agent for the purpose thereof, or interest himself therein, and thus entitle himself to compensation from both vendor and vendee, is grounded on the infallible declaration that 'no man can serve two masters.' As a rule of public policy, it is distinctly recognized in our text-books on agency, and in numerous adjudicated cases, among which are Everhart v. Searle, 71 Pa. 256; Pennsylvania R. Co. v. Flanigan, 112 Pa. 558, 4 A. 364, and cases there cited. It forbids that any one intrusted with the interests of others shall in any manner make the business an object of personal interest to himself, because, from a frailty of nature, one who has the power will be too readily seized with the inclination to use the opportunity for serving his own interests at the expense of his principal. * * * The transaction is to be regarded as against the policy of the law. It matters not that no fraud was meditated, and no injury

done. The rule is not intended to be remedial of actual wrong, but preventive of the possibility of it."

In Sarshik v. Fink, 292 Pa. 256, 260, 141 A. 39, 40, the Court quotes with approval from Mitchell v. Schreiner, 43 Pa.Super. 633. In the latter case the Court below charged the jury that the double representations would not prevent the agent from recovering where the principal had knowledge that his agent was acting for the purchaser. The Court in Sarshik notes that the Court in Mitchell stated that this exception exists where both parties expressly agree that a person may act as the agent for both and recover, yet,—" 'It is well settled that such agreement cannot be inferred either from knowledge of the fact that the rule has been violated or from mere silence or failure to dissent at the time, or from all these combined. Nothing short of "clear and satisfactory proof of an agreement" to waive the rule can be regarded as sufficient for this purpose. * * * ' "

I heard the testimony of both plaintiff and defendant. I had an opportunity to observe them both on the stand. I am convinced that plaintiff did not make a full and complete disclosure of his double relationship, that defendant had no knowledge of such double relationship, and that obviously he did not consent to it nor did he waive the rule prohibiting such double dealing. Plaintiff's breach of good faith has precluded any right for compensation he might otherwise have.

In addition, the contract was definitely rescinded or terminated by mutual agreement in September, 1958, so from that time, in any event, plaintiff would not be entitled to any compensation.

Testimony as to the counterclaim is totally inconclusive and no recovery can therefore be had.

### Conclusions of Law

1. This Court has jurisdiction of the parties and the matter in controversy.

2. Plaintiff has failed to meet the burden of proving that he performed the duties incumbent on him under the terms and conditions of the agreement.

3. The agreement was prepared by plaintiff and will therefore be most strongly construed against him.

4. Plaintiff breached his duty of good faith imposed by the agency relationship and is therefore not entitled to recover commissions based on the agreement.

5. Defendant has not established his claim for damages as asserted in his counterclaim.