In re Beatrice BARKER, Debtor.

Beatrice Barker, Plaintiff,

v.

Altegra Credit Company, Gelt Finan-
cial Corporation, and McGlawn &
McGlawn, Inc., Defendants.

Bankruptcy No. 99–32081DAS.
Adversary No. 99–1030.

United States Bankruptcy Court,
E.D. Pennsylvania.

June 15, 2000.
Supplemental Opinion July 20, 2000.

Alan M. White, Community Legal Services, Philadelphia, PA, for Debtor.

Bonnie Golub, Philadelphia, PA, for Altegra Credit Company.

William Goldstein, Bensalem, PA, for Gelt Financial Corporation.

Stuart A. Eisenberg, Warminister, PA, for McGlawn & McGlawn, Inc.

Edward Sparkman, Philadelphia, PA, trustee.

## OPINION

DAVID A. SCHOLL, Bankruptcy Judge.

### A. INTRODUCTION

What remains of the instant adversary proceeding ("the Proceeding") is the issue of whether, and if so in what amount, a mortgage Broker may be held liable to a Debtor-mortgagor for damages resulting from a detrimental loan transaction procured by the Broker on behalf of the Debtor, particularly when the mortgagee in the transaction and its assignee reached a pretrial settlement with the Debtor.

We find that the Broker clearly engaged in numerous deceptive and unfair practices that constitute fraud, breach of a fiduciary duty, and violations of the State Credit Services Act, 73 P.S. § 2181, *et seq.* ("the CSA"), as well as 73 P.S. § 201–1, *et seq.*, Pennsylvania's law prohibiting *unfair* and *deceptive practices act* ("UDAP"). However, prior to the trial, we approved a settlement which effectively restated the mortgage obtained by the Debtor in the transaction at issue to include many of the terms of her pre-transaction mortgage. The Debtor raised the possible application of the CSA and posited a measurement of damages which is bewildering to us for the first time in her post-trial brief. The Broker, meanwhile, confined its post-trial arguments to futilely contesting its liability. In light of these circumstances, we will request the parties to address the proper measurement of damages in supplemental briefing.

### B. PROCEDURAL AND FACTUAL HISTORY

BEATRICE BARKER ("the Debtor") filed an individual Chapter 13 bankruptcy petition on September 23, 1999. Her Third Amended Chapter 13 plan, paying her mortgagee's claim consistent with the settlement of same, was confirmed on May 3, 2000.

On November 24, 1999, the Debtor filed a Complaint to Challenge the Validity/Priority/Extent of Lien against ALTEGRA CREDIT COMPANY ("Altegra"), GELT FINANCIAL CORPORATION ("Gelt"), and WILLIAM McGLAWN t/a McGLAWN & McGLAWN. The trial of the Proceeding was originally Scheduled on January 11, 2000, and continued by agreement until March 9, 2000. Meanwhile, on February 29, 2000, the Debtor filed (1) a motion to approve a settlement with Altegra; (2) a motion seeking a default against Gelt; and (3) a motion to amend the Complaint, mainly to substitute McGLAWN & McGLAWN, INC. ("the Broker") for William McGlawn as a defendant.

The trial was again continued to April 27, 2000, on a must-be-heard basis. On March 24, 2000, the Debtor filed another motion to approve a settlement, this time with both Gelt and Altegra. The Broker did not object to this settlement ("the Settlement"), and this Court issued an Order approving the same on April 6, 2000.

Under the terms of the Settlement, Altegra reduced its secured claim of $23,765 under a mortgage loan calling for interest at 17.99 percent and payments of $293.73 monthly to a claim of $8000 to be repaid with interest at nine (9%) percent over 15 years, resulting in monthly payments of $81.00 monthly. In addition Gelt and Altegra agreed to pay $4000 and $750, respectively, towards the Debtor's claims for attorneys' fees. The trial against the only remaining defendant, the Broker, was continued again on a must-be-heard basis un-

til May 11, 2000. At the close of trial on May 11, 2000, the parties agreed to submit opening briefs by May 25, 2000, and reply briefs by June 1, 2000. Both parties submitted briefs to us on May 26, 2000, and neither submitted any other brief.

It was established at trial, through her brief testimony, that the Debtor contacted the Broker in March, 1998, to obtain a loan in the amount of $10,000 for the purpose of financing improvements to her home at 3027 West Colona Street, Philadelphia, PA ("the Home"). The Home was purchased in 1970 for $4000 and is co-owned by the Debtor and her 28-year-old daughter. The Debtor had heard about the Broker from certain media advertisements and indicated that she relied on its representations that it would obtain the desired home improvement loan for her.

Prior to the loan in question, the Debtor had a mortgage loan procured through the Pennsylvania Homeowner's Emergency Mortgage Assistance Program ("HEMAP") with a balance of approximately $8200. Although the Debtor was unable to recall the interest rate on the loan, it was asserted by her counsel without dispute that the maximum interest rate for HEMAP loans is fixed by law at nine (9%) percent. The Debtor testified that she had never requested a loan to refinance this obligation or to pay any of her other indebtednesses, but only to finance home improvements. However, the loan transaction arranged by the Broker paid off the Debtor's previous mortgage and many of her other obligations, which included over $4000 in delinquent water and sewer bills and over $1500 owed to the Philadelphia Gas Works.

Documents offered at trial revealed that the Debtor participated in two closings on the loan at issue because certain unexplained "errors" were committed at the first closing of June 22, 1998 ("Closing One"). The Debtor, along with her daughter, who co-signed on the loan, executed various documents at Closing One. The documents included a Truth–in–Lending disclosure statement describing a loan in the total amount of $19,500, a statement indicating that the Broker would change a fee of ten (10%) percent of the total loan amount, a Balloon Note, and a settlement statement stating the Debtor would receive a net disbursement in the amount of $612.21. The Debtor testified that, at Closing One, nobody explained to her that the Balloon Note obligated her to make a large lump sum payment at the end of the loan term, and that she was unaware of this fact. The Debtor also testified that, after Closing One, she still believed that she would receive the $10,000 she had requested for home improvements, although no funds whatsoever were disbursed to the Debtor at Closing One and no such disbursement was in fact contemplated.

The second closing ("Closing Two") occurred on July 8, 1998. The settlement statement completed at Closing Two revealed that the cash proceeds the Debtor would receive were reduced to $424.24. Despite receipt of only this amount, the Debtor stated that she was still unaware that she was not going to eventually receive the balance requested for her desired home improvements. Of course, she never received that sum.

During cross-examination, counsel for the Broker interrogated the Debtor concerning her past credit history, past due bills, and delinquent loans. Although this testimony revealed that the Debtor had previously held loans with numerous loan companies, we find that this evidence does not support the conclusion that the Debtor had much knowledge or experience with loan transactions, or with financial matters in general. Rather, we find that the Debtor was a credible witness who seemed extremely unsophisticated concerning financial matters. Specifically, we find that the Debtor was unaware that the loan transaction doubled the interest rate on her mortgage from nine (9%) percent to almost eighteen (18%) percent, that her home improvements would not be financed

thereby, and that the Balloon Note required a further lump-sum payment at its conclusion fifteen (15) years later.

Reginald McGlawn testified on behalf of the Broker. Although the record does not disclose his position, we assume that McGlawn is a principal of the Broker. McGlawn testified that his firm has specialized knowledge of the mortgage industry and holds itself out as having special expertise to procure loans for individuals with credit problems.

McGlawn's testimony, along with exhibits offered at trial, revealed that the Debtor first contacted the Broker on or about March 9, 1998, for a home improvement loan. A Gelt Pre-approval Conditions form ("the Form") submitted into evidence disclosed that Gelt approved a mortgage in the amount of $19,500 at an interest rate of 17.99% on March 10, 1998. One of the conditions included as an additional provision by Gelt specifically for this loan stated "MAX CASH OUT IS 10% OF LOAN AMOUNT."

The Broker conceded that the Form, not given to the Debtor, provided it with positive knowledge, as of March 10, 1998, that the interest rate offered by Gelt was 17.99% and that the cash proceeds from the loan of $19,500 would be insufficient to finance the desired home improvements. McGlawn never stated that this information was disclosed to the Debtor.

McGlawn challenged the Debtor's assertion that she was not given notice of the Broker's fee prior to Closing One by stating that all of its clients are made aware of its fees during telephone conversations prior to scheduling an appointment with the Broker. This testimony did not outweigh the Debtor's testimony to the contrary.

The Debtor, in her post-trial submissions, alleges two general types of causes of action against the Broker: (1) common law fraud and breach of fiduciary duties; and (2) statutory claims based on UDAP and the CSA, the latter of which is not referenced in the Amended Complaint.

The common-law fraud claim is premised on the Broker's misrepresentations and omissions, that include (1) representing to the Debtor that she would get the sums which she requested for her desired $10,000 home improvements, even though, as early as March 10, 1998, the Broker had positive knowledge that the Debtor was not authorized to receive more than $1,950 in cash; (2) failing to offer convincing evidence to support its assertion that the Debtor had knowledge of the ten (10%) percent of its fee prior to Closing One or at even after Closing Two; (3) failing to explain to the Debtor that executing a Balloon Note created an obligation to make a large lump sum payment at the end of the loan term; and (4) failing to advise the Debtor of the detrimental financial consequences of refinancing a HEMAP loan with a nine (9%) percent interest rate with a loan bearing an 18% interest rate.

The Debtor then noted that loan brokers are subject to regulation under the CSA and that the Broker did not comply with that law. She averred that the commissions of the common law torts and the Broker's violations of the CSA gave rise to claims under UDAP.

The Debtor then calculated her damages by beginning with an estimate that she would have paid an additional $43,000 in interest over the term of the loan procured by the Broker, as compared to the interest she would have paid on the $8,200 principal balance of the HEMAP loan with its nine (9%) percent interest rate, if the loan had not been recast in the Settlement. This figure was then discounted to its alleged present value of $25,000, and total actual damages are thereupon estimated at $28,716.54, calculated by adding to the $25,000 the amount of $3,716.54 in fees and costs charged by the Broker. Finally, the Debtor invoked UDAP's provision allowing treble damages, 73 P.S. § 201–9.2(a), resulting in a calculation of total damages at $86,149.62.

Only at this point is the Debtor's settlement with Gelt and Altegra referenced, as to which it is averred that it reduced the principal loan amount from $19,500 to $8,000 and restored the nine (9%) percent interest rate of the HEMAP loan. Thus, the settlement's effect is measured as reducing the loan principal by $11,500 and eradicating $25,000 in excess interest payments. The Debtor concluded that the Broker is liable for $49,649.62, by taking the difference between the $86,149.62 damage estimate and the $36,500 alleged value of her settlement with Gelt and Altegra.

The Broker's short brief begins from the faulty premise that the Debtor either wanted or needed a consolidation loan to pay off her bills and not a loan to finance home improvements. Without further explanation, the fraud claim is denounced as "'made up' without basis." The Broker argued there was no fiduciary duty because this was not a relationship in which it exercised superiority, influence, and control over the Debtor.

Finally, the Broker argued that it did not violate UDAP because there was no evidence of illegal charges and no testimony in the record that the Debtor was informed that she would benefit from the transaction. Moreover, the Broker avers that the Debtor did in fact benefit from the transaction because certain of her delinquent obligations were paid.

The Broker's position was, basically, that it is not liable for any damages whatsoever suffered by the Debtor. Therefore, it never addressed the measurement of any damages against it in the seemingly likely alternative event that liability were found.

As a result of these submissions, we find that the parties have addressed only two alternatives, *i.e.*, to either hold that the Broker is not liable for any monetary damages, or to conclude that it is liable for $49,649.62, based on calculations which do not reflect the impact of the Settlement until the back end. We conclude that both damage assessments are significantly flawed. For the reasons set forth in our Discussion at pages 257–262 *infra*, we find that the Broker clearly engaged in deceptive and unfair trade practices that constituted fraud and a breach of its fiduciary duty, as well as violations of the various consumer protection laws invoked by the Debtor.

Intuitively, the Debtor's calculation of damages appears grossly excessive. It is only after damages are computed and trebled that the alleged benefits of the settlement are deducted. Particularly in light of the UDAP provision that only "actual damages sustained" can be trebled, 73 P.S. § 201–9.2(a), it seems clear to us that an analysis of the Debtor's actual damages, taking into account the terms of the Settlement, must precede any trebling. As a result, we will direct the parties to submit supplemental briefs, on or before June 23, 2000, addressing the issue of damages.

## C. DISCUSSION

### 1. The Broker Has Committed Common–Law Fraud.

The instant underlying loan transaction is another of the sort of oppressive transactions that were at issue in *In re Jackson*, 245 B.R. 23 (Bankr.E.D.Pa.2000); *In re Murray*, 239 B.R. 728 (Bankr.E.D.Pa.1999); *In re Williams*, 232 B.R. 629 (Bankr.E.D.Pa.1999), *aff'd as corrected*, 237 B.R. 590 (E.D.Pa.1999); and *In re Ralls*, 230 B.R. 508 (Bankr.E.D.Pa.1999). Unlike these cases, which focused exclusively on the mortgagees and/or their assignees, the Proceeding, in its present posture, focuses solely on the conduct of the Broker. *Compare Williams, supra,* 232 B.R. at 633 (involved the same Broker).

To establish a valid fraud claim against the Broker, the Debtor was required to demonstrate each of the following: (1) the Broker made a representation; (2) that representation was material to the loan agreement; (3) the Broker had actual knowledge that this representation was

false, or acted with reckless indifference to its truth; (4) the Broker's intent was to mislead the Debtor; (5) the Debtor was justified in relying on the Broker's representations; and (6) her damages were the proximate result of the Broker's conduct. *See In re Zisholtz,* 226 B.R. 824, 828 (Bankr.E.D.Pa.1998), citing *In re Wright,* 223 B.R. 886, 896 (Bankr.E.D.Pa.1998). *See also, e.g., In re Orthopedic Bone Screw Products Liability Litigation,* 159 F.3d 817, 822 (3d Cir.1998); and *Wittekamp v. Gulf & Western, Inc.,* 991 F.2d 1137, 1142 (3d Cir.), *cert. denied,* 510 U.S. 917, 114 S.Ct. 309, 126 L.Ed.2d 256 (1993). The Debtor has the burden of proving every one of these elements of fraud by the exacting standard of clear and convincing evidence. *See, e.g., Wright, supra,* 223 B.R. at 897.

 We find that the Debtor has satisfied the exacting standard of proving every element of her claim for fraudulent misrepresentations and omissions. The Broker represented that the Debtor would get the money for home improvements, even though, as early as March 10, 1998, Gelt had provided the Broker with written notice that the cash disbursement to the Debtor could not be greater than $1,950, representing ten (10%) percent of the loan proceeds. The Broker also failed to provide the Debtor with information concerning its fee prior to Closing One.

Further, the Broker omitted any explanation of the Balloon Note, which obligated the Debtor to make a large lump sum payment at the end of the loan term. In fact, we have carefully reviewed a copy of the Note and are unable ourselves to find any disclosure whatsoever of even a general estimate of the lump sum that will be required. The presence and amount of this payment could be ascertained only with tables or extensive calculations which the Debtor was clearly incapable of making. The failure to provide such pertinent information to the Debtor certainly constitutes a material omission.

Finally, we find that a business which holds itself out to the public as having expertise in the mortgage industry commits a material omission where it fails to advise its own client of the potential detrimental effects of entering into such a transaction. Here, the Broker allowed an unsophisticated borrower to refinance a mortgage that doubled her previous interest rate. In fact, the evidence at trial indicates that the Debtor was never informed that her HEMAP loan was paid off as part of the new loan and that she was unaware of the consequences of this until it was too late to do anything about it.

Thus, the Debtor has satisfied the first four elements of fraud because the foregoing material omissions and misrepresentations were committed by an experienced mortgage broker. At a minimum, the Broker acted with reckless indifference by leading an unsophisticated consumer into a detrimental loan transaction. It is quite clear to us that the Broker's intent was in fact to mislead the Debtor.

Moreover, we find that the Debtor was justified in relying on the Broker's representations. As a consumer who recognized her inexperience in the area of finances, the Debtor consulted a broker that advertised its "expertise" in the field. The Debtor indicated to the Broker her reason for seeking a loan, *i.e.,* to finance home improvements, and the Broker had assured her that she would be able to secure the loan for her desired purpose. There was no reason that the Debtor should have suspected that the Broker's intentions were anything less than securing the most advantageous loan possible for its client.

Finally, the Debtor adequately demonstrated that her reliance on the Broker resulted in some proximate financial damages. The Debtor's calculations reveal that she would have paid thousands of dollars in additional interest over the term of the loan had it not been recast by the terms of the Settlement. Thus, the Debtor has proved all the elements of common law fraud, and has only failed to adequate-

ly address precisely how her damages should be measured because of the presence of the Settlement, which has relieved the Debtor from certain potential damages.

### 2. The Broker Breached Its Fiduciary Duties to the Debtor.

Having found that the Broker defrauded the Debtor leads almost inevitably to the conclusion that the Broker breached its fiduciary duties to the Debtor as well. As the Debtor argued, the Broker was the agent of the Debtor-principal charged with the undertaking of obtaining a loan to finance home improvements. *See Basile v. H & R Block, Inc.,* 1999 PA Super 44, 729 A.2d 574, 580–82, *appeal allowed,* 560 Pa. 717, 745 A.2d 1216 (1999) (tax preparer is agent of its customer); and *Eckrich v. DiNardo,* 283 Pa.Super. 84, 90, 423 A.2d 727, 729 (1980) ("It is established that the broker-client relationship is primarily that of principal and agent. *Brown & Zortman v. Pittsburgh,* 375 Pa. 250, 100 A.2d 98 (1953); *Seligson v. Young,* 189 Pa.Super. 510, 151 A.2d 792 (1959)."). As the Court states in *Garbish v. Malvern Federal Savings & Loan Ass'n,* 358 Pa.Super. 282, 296, 517 A.2d 547, 553–54 (1986):

> Under Pennsylvania law, the duty of an agent to his principal is one of loyalty in all matters affecting the subject of his agency, and "the agent must act with the utmost good faith in the furtherance and advancement of the interests of his principal." *Sylvester v. Beck,* 406 Pa. 607, 178 A.2d 755 (1962). This duty is the same as that of a fiduciary which has been described as the duty to act for the benefit of another as to matters within the scope of the relation. Restatement of Trusts, 2d, § 2. Fiduciary relations include, among others, principal and agent. *Id.,* comment (b). Because the relationship between the parties in this case was an agency relationship, appellant owed appellees a fiduciary duty and

its conduct must be measured against the standard of care owed by a fiduciary.

In its role as an agent, a broker has a duty to "advise his principals of relevant facts and circumstances known to the broker." *Alfaro v. E.F. Hutton & Co., Inc.,* 606 F.Supp. 1100, 1120 (E.D.Pa.1985). *See also Lichtenstein v. Kidder, Peabody, & Co., Inc.,* 840 F.Supp. 374, 388 (W.D.Pa. 1993); *Merrill Lynch, Pierce, Fenner & Smith v. Perelle,* 356 Pa.Super. 165, 183, 514 A.2d 552, 560 (1986) (agent has a duty to use a reasonable effort to give principal information which is relevant to affairs entrusted to him); and RESTATEMENT (SECOND) OF AGENCY, § 381, at 182 (1958).

In defense, the Broker cited *Pennsylvania Dep't of Transp. v. E–Z Parks, Inc.,* 153 Pa.Cmwlth. 258, 268, 620 A.2d 712, 717 (1993), for the principle that no fiduciary relationship existed between the Broker and the Debtor because the latter did not vest the former with substantial control over her financial affairs. *E–Z Parks* involved a quite distinct attempt of a party contracting with a state agency to argue that the agency had fiduciary duties to it. It is difficult to imagine a state agency as a fiduciary of a private party with which it contracts. A contractual relationship does not create a fiduciary relationship. However, the instant relationship of the Debtor and the Broker was not simply a contractual relationship. The unsophistcated Debtor entrusted the acquisition of a home improvement loan which would best save her interests to the Broker. In fact, the Debtor's lack of financial sophistication and knowledge caused her to entrust almost a blind faith to the Broker in its undertaking.

As it developed, the Broker failed to obtain the home improvement financing sought by the Debtor and substituted a consolidation loan to satisfy certain of her indebtednesses without informing her and without taking either her wishes or needs into consideration. The loan obtained did

not serve the Debtor's wants or needs. Thus, the Broker's motivation for producing the loan was clearly not to serve the Debtor's interest in obtaining a home improvement loan, but to serve its own interest of obtaining a handsome broker's fee. Such self-dealing constitutes a flagrant violation of the Broker's fiduciary duties to the Debtor. *See Shapiro v. Stahl,* 195 F.Supp. 822, 825–26 (M.D.Pa.1961).

For the foregoing reasons, we conclude rather easily that the Broker is guilty of breaching the duties arising from its fiduciary relationship with the Debtor.

3. *The Broker Is Liable to the Debtor for Certain Damages Under the CSA.*

■ In her brief the Debtor, for the first time, references claims which she asserts against the Broker under the CSA. The CSA is Pennsylvania state legislation enacted in 1992 to regulate the conduct of "credit services organizations" and "loan brokers,"

With certain exceptions which do not appear applicable, the CSA defines a "loan broker," at 73 P.S. § 2182, as

(1) [a] person who

(i) For or in expectation of a consideration fee arranges or attempts to arrange or offers to fund a loan of money, a credit card or line of credit for personal, family or household purposes.

(ii) For or in expectation of a consideration fee assists or advises a borrower in obtaining or attempting to obtain a loan of money, a credit card, a line of credit or related guarantee, enhancement or collateral of any kind or nature.

(iii) Acts for or on behalf of a loan broker for the purpose of soliciting borrowers.

(iv) Holds himself out as a loan broker.

The Broker clearly appears to meet all of these criteria.

■ The CSA provides, at 73 P.S. § 2188(c)(2), as follows:

(c) **Prohibited acts.**– No loan broker shall:

. . .

(2) Make or use any false or misleading representations or omit any material fact in the offer or sale of the services of a loan broker or engage directly or indirectly in any act that operates or would operate as fraud or deception upon any person in connection with the offer or sale of services of a loan broker, notwithstanding the absence of reliance by the buyer. . . .

Our findings, at pages 257–260 *supra,* that the Broker engaged in common law fraud and violated its fiduciary duties to the Debtor constitute sufficient support, in and of themselves, to result in a violation of 73 P.S. § 2188(c)(2).

■ The CSA further states that any violations of its provisions are deemed to be violations of UDAP. 73 P.S. § 2190(a). In addition, the CSA includes its own measure of damages, at 73 P.S. § 2191, which states as follows:

Any buyer or borrower injured by a violation of this act or by the credit services organization's or loan broker's breach of a contract subject to this act may bring an action for recovery of damages. Judgment shall be entered for actual damages, **but in no case less than the amount paid by the buyer or borrower to the credit services organization or loan broker,** plus reasonable attorney fees and costs. An award, if the trial court deems it proper, may be entered for punitive damages (emphasis added).

■ The CSA thus enhances the principle that the Broker's fraud and breach of fiduciary duties constitutes a violation of UDAP which may qualify for UDAP's treble damages provision. In addition, the CSA provides that, if any actual damages whatsoever are proven, the offending loan

broker is liable for an amount no less than the amount of fees paid to it by the borrower, as well as reasonable attorney fees and costs. Here, the Broker charged the Debtor fees of $1950. It is therefore difficult to see how the Broker's damages for the pertinent CSA violation could be less than that amount.

The issue which the parties must address is whether damages must be allowed in a greater amount under the common law tort theories advanced by the Debtor or, most notably, under UDAP. At this point, we will only add a discussion of the Broker's potential damages under UDAP.

### 4. The Broker Appears Liable for at Least Some Additional Damages Under UDAP.

Like most states, Pennsylvania, in 1968, enacted UDAP as a statute aimed at generally prohibiting and punishing certain deceptive trade practices. *See In re Russell*, 72 B.R. 855, 870 (Bankr.E.D.Pa. 1987). In 1976, 73 P.S. § 201–9.2 was added to UDAP to expressly provide parties victimized by practices prohibited thereby with a private cause of action against those who victimized them. *Id.* at 871. Although there is a broad range of other Pennsylvania consumer protection legislation, 73 P.S. § 201–9.2(a) is often the only section that specifically provides a private cause of action to aggrieved consumers as to many of these laws. Any substantial violation of any of these consumer protection laws would "certainly seem to us to constitute *per se* 'fraudulent conduct which creates a likelihood of confusion or of misunderstanding.'" *Id.*

Under UDAP, a plaintiff must have suffered "ascertainable loss of money or property" to recover actual damages, which may be trebled, or $100.00, whichever is greater. UDAP is a remedial statute that should be liberally construed to effect its objective of protecting consumers in a number of various activities. *Commonwealth v. Monumental Properties, Inc.,*

459 Pa. 450, 457–58, 329 A.2d 812, 815–16 (1974).

The business of a loan broker such as the instant Broker is conduct which is clearly a sale of a service within the scope of UDAP. In *In re Andrews*, 78 B.R. 78, 82 (Bankr.E.D.Pa.1987), we held that any violation of consumer protection laws by a mortgage lender may give rise to a cause of action within the scope of UDAP. *See also In re Jungkurth*, 74 B.R. 323, 329 (Bankr.E.D.Pa.1987), *aff'd*, 87 B.R. 333 (E.D.Pa.1988) (extending scope of UDAP to business loans secured by mortgages).

Other jurisdictions have applied similar consumer protection laws to mortgage brokers. A Michigan court applied a state consumer protection statute to a mortgage broker who advertised its services as procuring loans for borrowers seeking personal home loans in *In re Dukes*, 24 B.R. 404, 410 (Bankr.E.D.Mich.1982). Moreover, the CSA, at 73 P.S. § 2190(a), expressly states that any violation of the CSA is deemed to be a violation of UDAP.

In the instant case, the Broker's conduct was clearly unfair and deceptive. We find the Broker may have violated the UDAP's specific prohibitions on "[a]dvertising ... services with an intent not to sell them as advertised," 73 P.S. § 201–2(4)(ix), and "[k]nowingly misrepresenting that services, ... are needed if they are not needed." 73 P.S. § 201–2(4)(xv). In any event, the Broker clearly violated the "catch-all" provision barring it from "[e]ngaging in any other fraudulent or deceptive conduct which creates a likelihood of confusion or of misunderstanding," 73 P.S. § 201–2(4)(xxi), by (1) failing to disclose to the Debtor the detrimental effect of refinancing a loan with a nine (9%) percent interest rate for a loan with a 17.99% interest rate; (2) failing to give notice to the Debtor that the loan amount was $19,500 when she requested a loan for $10,000; (3) failing to adequately disclose to the uneducated Debtor that executing a

Balloon Note would result in a final large lump sum payment; (4) failing to disclose or estimate the amount of the lump sum payment in the Balloon Note. (*Compare In re Fricker*, 115 B.R. 809, 822 (Bankr. E.D.Pa.1990)); (5) failing to inform the Debtor that the proceeds that she would ultimately receive from a $19,500 loan were less than $500, an amount clearly insufficient to complete the intended home improvements; and (6) failing to notify the Debtor that the loan approved by Gelt on March 10, 1998, limited cash disbursements to $1,950, representing 10% of the total loan, which is an amount clearly insufficient to cover the intended home improvements.

In measuring the Debtor's damages under UDAP, we draw the parties' attention to our decision in *In re Milbourne*, 108 B.R. 522, 543–44 (Bankr.E.D.Pa.1989). There, we found that a lender violated the UDAP "catch-all" provision by failing to advise borrowers of their economic detriment in refinancing loans as opposed to writing requests for further advances as new loans. *Id.* at 535–39. This conduct of recasting mortgages in forms detrimental to borrowers is similar in substance to the conduct of the Broker in its effect on the Debtor. *See also Fricker, supra*, 115 B.R. at 818–24 (violation of state Debt Pooling Act, 18 Pa.C.S.A. § 7312, in refinancing of business loan transaction is violative of UDAP). However, when we found that the *Milbourne* debtor-plaintiff had suffered certain actual damages but we were unable to accept the debtor plaintiff's quantification of her actual damages, we allowed the plaintiff to recover $100 for each of five transactions in which this conduct took place.

We therefore conclude that the Debtor is entitled to at least some actual damages under UDAP as a result of the Broker's conduct. However, for the reasons stated at pages 256–258 *supra*, we are unwilling to qualify same without giving the parties at least some additional opportunity to address this issue further. We also note that both the CSA and UDAP permit recovery of reasonable attorneys' fees and costs, and we further cannot quantify any such amounts until the damages are fixed.

## D. CONCLUSION

An order finding the Broker liable to the Debtor for fraud, breach of a fiduciary duty, and violation of the CSA and UDAP, but directing the parties to render supplemental submissions on this subject, is therefore entered. Of course, we urge the parties, guided by this Opinion, to settle the issue of damages between them.

## SUPPLEMENTAL OPINION

## A. INTRODUCTION

In our Opinion of June 15, 2000, in the instant adversary proceeding ("the Proceeding"), now reported only at 2000 WL 777857 ("*Barker I*"), we held that MCGLAWN & MCGLAWN, INC., a mortgage broker ("the Broker"), committed fraud, breached its fiduciary duty to the Debtor-borrower, BEATRICE BARKER ("the Debtor"), and violated two Pennsylvania consumer protection statutes in arranging a loan transaction for the Debtor which we found was detrimental to the Debtor's interests. However, we refrained from liquidating the Debtor's damages until we gave the Broker and the Debtor, who posed the following extreme respective positions, an opportunity to address a proper measurement of damages in light of *Barker I*: (1) no damages occurred; and (2) the debtor was entitled to over $86,000 damages by disregarding a settlement between the mortgagee, its assignee, and the Debtor.

Unfortunately, both parties, in supplement submissions, refused to compromise their initial extreme postures. We nevertheless proceed to apply the principles of *Barker I* in concluding that the Broker is liable for statutory damages in the amount of the $1950 fee that it collected as compensation for procuring the detrimental

loan under the state Credit Services Act, 73 P.S. § 2181, *et seq.* ("the CSA"); statutory damages in an additional total amount of $500 for its numerous violations of Pennsylvania's unfair and deceptive practices act, 73 P.S. § 201–1, *et seq.* ("UDAP"); and punitive damages in the amount of $5000, resulting in a total award to the Debtor of $7450, plus reasonable attorneys fees and costs to be subsequently determined.

## B. PROCEDURAL AND FACTUAL HISTORY

As this opinion supplements *Barker I,* we incorporate same, at *1–*4, to the point of that Opinion. At the end of *Barker I,* at *10, we directed the parties to submit supplemental briefs, on or before June 23, 2000, addressing the issue of damages in light of that decision.

In her briefing prior to *Barker I,* the Debtor had calculated her damages under UDAP by first asserting that she would have had to have paid an additional $43,000 in interest over the term of the loan procured by the Broker with an interest rate of nearly eighteen (18%) percent, as compared to the interest she would have repaid under her previously pending loan with a principal balance of $8200 and an interest rate of nine (9%) percent. The Debtor then postulated that the $43,000 excessive interest payments reduced to their present value would have resulted in $25,000 damages. Fees and costs to the Broker totaling $3,716.54 were added to the Debtor's calculation to arrive at total actual damages at $28,716.54. The Debtor then invoked UDAP's provision for treble damages, 73 P.S. § 201–9.2(a), resulting in a calculation of gross damages at $86,149.62.

The Debtor next posited that the value of her settlement ("the Settlement") with the original lender in the loan transaction at issue, Gelt Financial Corporation ("Gelt"), and Gelt's assignee, Altegra Credit Company ("Altegra"), was $36,500. In so doing, she reasoned that the terms of the Settlement reduced the principal loan balance from $19,500 to $8,000, resulting in a reduction of $11,500. Further, she alleged that the Settlement saved her the $25,000 in the present value of her excess interest payments. Thus, the $86,149.62 total damage calculation was reduced by $36,500, leaving the Broker liable for $49,649.62.

In response to these submissions, we stated in *Barker I,* at *4, that "the Debtor's calculation of damages appears grossly excessive" because "it seems clear to us that an analysis of the Debtor's actual damages, taking into account the terms of the Settlement, must precede any trebling" of damages under UDAP. Nevertheless, in her supplemental brief, the Debtor did not proffer a different formula or analysis to calculate her damages in light of *Barker I.* Rather, she merely reiterated her position that the Broker is liable for $49,649.62, this time merely explaining in greater detail how she arrived at this figure. Alternatively, the Debtor suggested that we should award punitive damages in the amount of $28,716.54, which represents her figure for "actual damages" prior to invoking UDAP's treble-damage provision.

Similarly, the Broker, in its supplemental brief, stubbornly maintains its position that it is not liable to the Debtor for any damages whatsoever or alternatively, for no more than $100 in damages. In its pre-*Barker I* briefing, the Broker argued that the Debtor actually benefitted from the original loan transaction because various of her bills were paid off by the loan procured by the Broker. However, in *Barker I,* at *7, we stated that

> [t]he loan obtained did not serve the Debtor's wants or needs. Thus, the Broker's motivation for producing the loan was clearly not to serve the Debtor's interest in obtaining a home improvement loan, but to serve its own interest of obtaining a handsome broker's fee. Such self-dealing constitutes a flagrant violation of the Broker's fiduciary duties to the Debtor. . . .

Nevertheless, the Broker's position, as expressed in its supplemental brief, continues to be that the Debtor should not be awarded any or very little monetary damages because she benefitted from the loan transaction.

Thus, although the Broker was seemingly bound by our *Barker I* conclusions, at *4–*6, that it engaged in fraud; breached its fiduciary duties to the Debtor, *id.* at *6–*7; and was at least liable for $1950 in statutory damages under 73 P.S. § 2191 of the CSA, *id.* at *8, the most that the Broker conceded is that the Debtor might recover damages of $100, based on our finding of UDAP damages under the facts of *In re Milbourne,* 108 B.R. 522, 543–44 (Bankr.E.D.Pa.1989).

## C. DISCUSSION

### 1. Neither Party Has Adhered to "the Law of the Case" Established in Barker I in Their Present Briefing.

■ We begin our discussion by noting that both the Debtor and the Broker have failed to limit their supplemental briefs to the narrow issue of the calculation of damages in light of our decision in *Barker I.* In so preceding the parties failed to recognize the principles of the "law of the case" doctrine, which provide that a court should change a prior ruling in a case "only where that ruling is 'clearly erroneous' and it 'would work a manifest injustice' to adhere to it." *In re Cole,* 89 B.R. 433, 436 (Bankr. E.D.Pa.1988), citing, *e.g., Arizona v. California,* 460 U.S. 605, 618, 103 S.Ct. 1382, 75 L.Ed.2d 318 (1983); *Cowgill v. Raymark Industries, Inc.,* 832 F.2d 798, 802–04 (3d Cir.1987); and *Zichy v. Philadelphia,* 590 F.2d 503, 508 (3d Cir.1979).

The approaches of both parties can thus be likened to the "regurgitating issues and arguments that we rejected" in a prior decision, which we regarded with "considerable dismay" in *In re Rothman,* 206 B.R. 99, 104 (Bankr.E.D.Pa.1997). Therefore, we are compelled to proceed, with little help from the parties, to make a determination of the damages properly payable by the Broker to the Debtor in the Proceeding in light of *Barker I.*

### 2. The Broker Is Clearly Liable for Statutory Damages in the Amount of the $1950 Fee It Charged the Debtor, Pursuant to the CSA.

■ The CSA explicitly states, at 73 P.S. § 2191, that a borrower injured by a loan broker is entitled to recover "in no case less than the amount paid by the buyer or borrower to the . . . loan broker." *See also* 73 P.S. § 2188. Our research has not yielded any cases applying the CSA; however, the Broker in the instant case meets the definition of "loan broker" within the CSA. Moreover, in *Barker I,* at *8, we found that § 2188(c)(2) of the CSA prohibits exactly the kind of deceptive behavior engaged in by the Broker. The Broker is thus prohibited from retaining its commission received in the transaction because it engaged in intentional, improper practices. Our findings that the Broker engaged in common law fraud and violated its fiduciary duties are quite sufficient to establish blatant and fundamental violations of the CSA on its part. *See Barker I,* at *7–*8.

The Broker's proposal for calculating damages is flawed because it disregards the express language of the CSA. The only case the Broker cites in its supplemental brief is *Milbourne, supra,* for the proposition that the maximum amount the Debtor in the instant case should recover is $100. However, the *Milbourne* Debtor received $100 for each of five separate violations of UDAP, in addition to other remedies, including recession of the loans and other monetary damages under the Truth in Lending Act. 108 B.R. at 544–45. Here, the Broker failed to acknowledge that its conduct violated the express language of the CSA, in addition to UDAP violations, and the minimum amount of a borrower's recovery as established by 73 P.S. § 2191 of the CSA, as indicated above, is the broker's fee. *See* 73 P.S. § 2191. Thus,

we reject the Broker's argument that it is liable to the Debtor for a maximum of $100 in damages and easily find that the Debtor must recover at least the $1950 Broker's fee under the CSA.

3. *The Debtor Failed to Quantify Any "Actual Damages" Pursuant to UDAP; However, the Broker's Conduct Renders It Liable for an Additional $500 in Statutory Damages Under UDAP.*

UDAP expressly limits recovery to "actual damages," which may be trebled, or $100, whichever is greater. 73 P.S. § 201–9.2(a). In *Barker I*, at *8–*10, we held that the Broker had violated at least UDAP's "catch-all" provision that prohibits any "fraudulent or deceptive conduct which creates a likelihood of confusion or misunderstanding." 73 P.S. § 201–4(xxi). The Broker's distinct acts of misconduct in the instant case, as set forth in *Barker I*, at *9, include (1) failing to disclose to the Debtor the detrimental effect of refinancing her pending loan with a nine (9%) percent interest rate in a loan with a 17.99% interest rate; (2) procuring a consolidation loan for $19,500, although the Debtor requested a home improvement loan for $10,000; (3) allowing the Debtor to execute a balloon note without disclosing the amount of the final lump payment, or even explaining to the naïve Debtor that a balloon note requires a large payment at the end of the loan term; and (4) failing to disclose to the Debtor that the maximum cash disbursement that would be permitted by the lender to her was $1,950, and that the cash proceeds she would ultimately receive would be less than $500, an amount clearly insufficient to fund the home improvements the she intended to finance with the loan proceeds.

We conclude that each of the above acts is sufficiently discrete and "unfair" to constitute a separate violation of UDAP's "catch-all" provision. Pursuant to our holding in *Milbourne*, the Broker had a duty to disclose to the Debtor more eco-

nomically feasible options than refinancing a mortgage with a nine (9%) percent interest rate with a mortgage bearing interest of approximately eighteen (18%) percent. Likewise, the Debtor should have been advised of the economic consequences of executing a balloon note. Like the debtor in *In re Smith*, 866 F.2d 576, 584–85 (3d Cir.1989), the instant Debtor had the right to expect fair and aboveboard treatment from the Broker, who was allegedly procuring the best loan terms available for her to obtain the desired home improvements on her behalf. Each of the acts set forth in the preceding paragraph reveals distinct incidents of substantially unfair treatment of the Debtor by the Broker which are sufficient to constitute discrete UDAP violations in the context of the fiduciary relationship that existed between the parties.

In *Barker I*, at *7, we also stated the Broker may have violated UDAP's prohibition on "[a]dvertising . . . services with an intent not to sell them as advertised," 73 P.S. § 201–4(ix), and "[k]nowingly misrepresenting that services . . . are needed if they are not needed." 73 P.S. § 201–4(xv). The record was not sufficiently developed to support a finding that the Broker engaged in false advertising practices. However, we find that there are ample facts of record to support the conclusion that the Broker knowingly misrepresented to the Debtor that she needed unnecessary services. Specifically, the Broker led the Debtor into a transaction where she refinanced an existing mortgage when the Debtor had requested home improvement financing. In fact, we found in *Barker I*, at *6, that the Broker arranged the use of the loan proceeds to pay off the Debtor's various unsecured debts "without informing her and without taking either her wishes or needs into consideration."

In *Milbourne, supra*, we stated that "a showing of 'actual damages' is a prerequisite of any successful cause of action under 73 P.S. § 201–9.2(a)." 108 B.R. at 544. Nevertheless, we have also held

elsewhere that a plaintiff's failure to quantify damages does not preclude a finding that a plaintiff is entitled to recover some damages. *In re Jungkurth,* 74 B.R. 323, 335–36 (Bankr.E.D.Pa.1987), *aff'd,* 87 B.R. 333 (E.D.Pa.1988). *See also In re Chapman,* 77 B.R. 1, 6 (uncertainty as to the correct measure of damages does not preclude recovery if a defendant is clearly liable to the plaintiff).

The lender in *Milbourne* was liable under UDAP for failing to disclose to the debtor the advantages of making new loans, as opposed to refinancing existing ones. *See also Besta v. Beneficial Loan Co. of Iowa,* 855 F.2d 532 (8th Cir.1988) (lender has a duty to at least disclose more economical feasible options to borrowers); *In re Stewart,* 93 B.R. 878, 887 (Bankr. E.D.Pa.1988) (retailer marked up prices of appliances to credit customers to such an extent that it violated UDAP); and *In re Wernly,* 91 B.R. 702, 704 (Bankr.E.D.Pa. 1988) (check casher's charges were so unconscionable that they amounted to UDAP violations). In *Smith, supra,* the court found that a lender's substantially unfair conduct was sufficient to constitute a violation of UDAP because a homeowner borrowing money from a lending institution "may reasonably expect that he or she will receive fair and aboveboard treatment in their dealings and no undue advantage will be taken by the lender." 866 F.2d at 584.

Because we found that the *Milbourne* debtor had suffered certain actual damages, but that these were incapable of quantification, we awarded the plaintiff $100 for each of five transactions that violated UDAP. 108 B.R. at 544–45. However, the *Milbourne* debtor was not entitled to recover additional damages for UDAP violations arising from the lender's failure to disclose the advantages to it of taking multiple mortgages because the debtor failed to demonstrate that she incurred any actual damages as a result of the lender's omission. *Id.*

The Debtor cites several out-of-state cases to support a proposition contrary to our conclusion in *Barker I,* at *4, referenced at page 263 *supra,* that actual damages should be trebled prior to deducting the value of the Settlement with the co-defendants. However, the circumstances which caused the courts to so proceed in those cases are distinguishable from those of the instant case. In *Seafare Corp. v. Trenor Corp.,* 88 N.C.App. 404, 408, 363 S.E.2d 643, 648 (1988), one of the cases cited by the Debtor, there was a jury verdict for the plaintiff in the amount of $400,000. The trial court deducted a $137,000 settlement with one defendant prior to trebling the $263,000 difference. The court relied on a state statute and a Texas case to conclude the trial court erred in deducting the settlement prior to trebling the judgment amount. 88 N.C.App. at 416–17, 363 S.E.2d at 652–53. The applicable statute, N.C.Gen.Stat. § 75–16 (1999), provided that "judgment shall be rendered ... for treble the amount fixed by verdict."

In contrast to the instant case, the dispute in *Seafare* was whether settlement with a co-defendant should be deducted from the amount of a judgment based on a jury verdict before or after trebling. Here, there has been no judgment. We are unwilling to equate the Debtor's asserted losses with actual losses determined by a jury verdict or a final judgment.

Similarly, *Providence Hospital v. Truly,* 611 S.W.2d 127 (Tex.Civ.App.1980), the Texas case cited by the *Seafare* court in support of its decision, holds that actual damages should be trebled prior to deducting the settlement with a co-defendant. However, the actual damage figure was, again, determined by a jury. The *Truly* jury found that a woman injured when a contaminated drug was injected in her eye during surgery was entitled to $15,000 as fair and reasonable compensation for her injuries. *Id.* at 130. The $15,000 was trebled to determine the *Truly* plaintiff's total damages. It is also noteworthy that the provision for trebling actual damages is mandatory under the Texas Deceptive

Trade Practices Act, whereas in Pennsylvania the court may use its discretion in deciding whether to award treble damages. *Compare* Tex.Bus. & Com.Code Ann., § 17.50 (West 1999), *with* 73 P.S. § 201–9.2(a).

Thus, in both of the cases cited by the Debtor, the basis of the damages was a jury verdict quantifying the "actual damages." Here, the Debtor is basing her damages on potential losses which did not in fact occur because of the Settlement and which no jury or other court has ever sustained. In these circumstances, we reiterate our unwillingness to accept the Debtor's damage calculations as any sort of basis for fixing her "actual damages" under UDAP. However, because we found that the Debtor incurred some unquantifiable actual damages as a result of five separate UDAP violations by the Broker, despite the Settlement, we will, as in *Milbourne*, award $100 for each of these five UDAP violations, or a total of $500 in consideration of the Broker's UDAP violations.

4. *The Debtor Is Entitled to a Punitive Damage Award of $5000 Because the Broker Engaged in Fraud and Violated Its Fiduciary Duties to Her.*

 Under Pennsylvania law, punitive damages may be awarded "only if an actor's conduct was malicious, wanton, willful, oppressive, or exhibited a reckless indifference to the rights of others." *Johnson v. Hyundai Motor America*, 698 A.2d 631, 639 (Pa.Super.1997). The purpose of punitive damages is to punish a guilty party for outrageous conduct and to deter similar conduct in the future. *See Kirkbride v. Lisbon Contractors, Inc.*, 521 Pa. 97, 103, 555 A.2d 800, 803 (1989). *See also In re Aponte*, 82 B.R. 738, 745–46 (Bankr. E.D.Pa.1988); and *In re Tigue*, 82 B.R. 724, 737–38 n. 3 (Bankr.E.D.Pa.1988).

 In determining the amount of the punitive damages to award, the trier of fact must consider the act or omission together with the motive of the wrongdoer and the relationship between the parties. *See Feld v. Merriam*, 506 Pa. 383, 395, 485 A.2d 742, 748 (1984), quoting *Chambers v. Montgomery*, 411 Pa. 339, 345, 192 A.2d 355, 358 (1963). The amount of punitive damages awarded should be gauged by the gravity of the offense and the defendant's financial position because "[t]he award must be sufficient to sting the pocketbook of the wrongdoer." *Aponte, supra*, 82 B.R. at 745, quoting *Mercer v. DEF, Inc.*, 48 B.R. 562, 566 (Bankr.D.Minn.1985).

A case in point is *In re B. Cohen & Sons Caterers, Inc.*, 97 B.R. 808, 817–18 (Bankr.E.D.Pa.1989), *aff'd in part & rev'd in part*, 108 B.R. 482 (E.D.Pa.1989), *appeal dismissed*, 908 F.2d 961 (3d Cir.1990), *clarified on remand*, 1990 WL 2632 (Bankr.E.D.Pa. Jan.11, 1990), *aff'd*, 124 B.R. 642 (E.D.Pa.), *aff'd*, 944 F.2d 896 (3d Cir.1991), where we awarded $10,000 in punitive damages to a catering business because its landlord had violated the automatic bankruptcy stay and destroyed or damaged a large amount of the debtor's property. We noted in that case that we did not consider this to be a particularly liberal damage award, given that the landlord was a large realty company that owned several shopping centers. *Id.* at 818. The debtor was justified in receiving $10,000 in punitive damages because the landlord's conduct was shocking, willful, and "characterized by a mode of destruction and disrespect for the law [and] the needs and interests of the Debtor ... which we find intolerable." *Id.*

By way of comparison, in *Aponte, supra*, the court noted that the wrongdoer was an individual of moderate income who operated a small and deteriorating commercial business. 82 B.R. at 746. Thus, the *Aponte* court awarded the Debtor only $2,000 in punitive damages as an appropriate amount to deter the wrongdoer from repeating his reprehensible conduct. *Id.* *See also In re Wagner*, 74 B.R. 898, 905 (Bankr.E.D.Pa.1987) (punitive damages of

$500 for an aggravated violation of the automatic stay was sufficient because the wrongdoer was a private individual with a moderate income).

 This is an instance where the deterrent and punitive purposes of a punitive damage award would be well-served. Punitive damages are appropriate here because the Broker's conduct revealed a flagrant disregard of its duty to act as a fiduciary on the Debtor's behalf. We also note that we are authorized to award the Debtor punitive damages in an amount in excess of the Debtor's compensatory or actual damages because Pennsylvania law does not mandate that punitive damages bear a direct relationship to compensatory damages. *See In re Valley Forge Plaza Associates,* 113 B.R. 892, 908 (Bankr. E.D.Pa.), *aff'd in part & rev'd in part on other grounds,* 120 B.R. 789 (E.D.Pa.1990). *See also Kirkbride, supra,* 521 Pa. at 103, 555 A.2d at 803. In fact, specific "actual damages" are not necessary to award punitive damages. *Valley Forge Plaza, supra,* 113 B.R. at 909; and *Kirkbride, supra,* 521 Pa. at 102, 555 A.2d at 802.

 In the instant case, we determine that $5000 in punitive damages is an appropriate award in light of the Broker's economic circumstances, as well as in light of its fraudulent conduct, blatant disregard for the CSA and UDAP, and lack of good faith and breach of fiduciary duties in intentionally deceiving an unsophisticated consumer. The record does not contain much evidence concerning the scale of the Broker's business or its financial condition. We believe, however, that the Broker is a relatively small commercial business that operates out of one office. Thus, we feel that an award to the Debtor of $5000 in punitive damages represents a rather substantial penalty which should adequately punish the Broker and deter any future similarly reprehensible conduct. The Broker's misstatements and omissions were shocking, particularly in light of our holding in *Barker I* that the Broker had a fiduciary duty to act in the best interests of the Debtor. Moreover, we found that the Broker's conduct was intentional or, at a minimum, sufficiently reckless to warrant an award of $5,000 in punitive damages to the Debtor.

Accordingly, we reject the Debtor's suggestion that we award her punitive damages of $28,716.34. That amount appears grossly excessive, particularly since the record did not contain evidence to support the conclusion that such an amount is reasonable in light of the Broker's financial position. Further, we reiterate that the gravity of the harm the Debtor suffered was greatly reduced by the terms of the Settlement with the other defendants.

In its supplemental brief, the Debtor devoted some attention to arguing that it is at this juncture entitled to attorneys' fees of $10,650 and costs of $587.10 from the Broker under the CSA, 73 P.S. § 2191, and under UDAP, 73 P.S. § 201–9.2(a), as interpreted in, *e.g., In re Andrews,* 78 B.R. 78, 85 (Bankr.E.D.Pa.1987); and *Croft v. P. & W. Foreign Car Service, Inc.,* 383 Pa.Super. 435, 439, 557 A.2d 18, 20 (1989), after taking account of the $4750 paid by Gelt and Altegra on account of the Debtor's attorneys fees.

However, It is not our practice to fix or even commence the process of awarding reasonable attorneys' fees and costs until after a final order fixing the damages has been entered. We are just now at that stage.

Our within order incorporates our usual procedure for determining such amounts. It also requires that the considerable damages awarded to the Debtor be, at best in the first instance, subject to administration by the Standing Chapter 13 Trustee.

## D. CONCLUSION

An Order finding the Broker liable to the Debtor for total damages of $7,450.00 and establishing the procedure for payment of this sum and submission of an application for attorneys' fees and costs

due to the Debtor from the Broker will be entered.