**In re Helen LEWIS, Debtor.**

**Helen Lewis, Plaintiff,**

v.

**Delta Funding Corporation and Bankers Trust Company of California, N.A., Defendants.**

**Bankruptcy No. 00–32042 (KJC).**
**Adversary No. 00–935.**

United States Bankruptcy Court,
E.D. Pennsylvania.

March 25, 2003.

Alan M. White, Philadelphia, PA, for Debtor.

Darryl J. Chimko, Rochester, MI, Stephen P. Doughty, Lyons, Doughty & Veldhuis, P.C., Mt. Laurel, NJ, Heidi R. Spivak, Mark J. Udren & Associates, Cherry Hill, NJ, for creditors.

## MEMORANDUM OPINION[1]

KEVIN J. CAREY, Bankruptcy Judge.

On December 11, 2002, Helen Lewis, a debtor in a case filed under chapter 13 of the Bankruptcy Code (the "Debtor"), filed an adversary proceeding to determine the validity, priority, and extent of the defendants' mortgage lien against the her residence. Currently before the Court is the Debtor's Motion for Summary Judgment.

## BACKGROUND

On July 16, 1997, the Debtor entered into a loan transaction (the "Loan") with Eagle National Bank ("Eagle") by executing a balloon note in the principal amount of $44,250.00, secured by a mortgage against the Debtor's residence located at 8045 West Chester Pike, Upper Darby, PA. See Balloon Note and Mortgage, attached as Exhibits A and B to the Defendants' Mem. of Law. The Loan paid off an existing mortgage, a low-rate assistance loan from the Pennsylvania Housing Finance Agency, several credit card bills, and city water and tax bills. See HUD–1 Settlement Statement, attached as Exhibit B to the Debtor's Mem. of Law. The Debtor received $7,500.32 cash proceeds. Id.

Anthony Jones ("Jones"), a mortgage loan broker, received a $3,097.50 broker fee, constituting 7% of the Loan amount. Id. The Loan was to be repaid in 179 installments of $523.96, with a final balloon payment of $39,885.02. See Federal Truth in Lending Disclosure Statement, attached as Exhibit C to Debtor's Mem. of Law.

On the same day as the Loan closing, Eagle assigned the mortgage to defendant Delta Funding Corporation ("Delta"). See Assignment of Mortgage, attached as Exhibit F to Debtor's Mem. of Law. Delta later assigned it to defendant Bankers Trust Company of California, N.A. ("Banker's Trust").[2] Id.

Bankers Trust obtained a foreclosure judgment against the Debtor in the Philadelphia County Court of Common Pleas on July 27, 2000. See Proof of Claim, attached as Exhibit D to Debtor's Mem. of Law. After the Debtor filed for bankruptcy protection on September 26, 2000, Delta filed a proof of claim demanding $54,190.81. Id. The Debtor filed an adversary complaint against the defendants, Delta and Bankers Trust (the "Defendants"), on December 11, 2000, asserting claims under the Truth in Lending Act, 15 U.S.C. § 1601, et seq. ("TILA"), the Home Ownership and Equity Protection Act, 15 U.S.C. § 1639, et seq. ("HOEPA"), the Real Estate Settlement and Procedures Act,12 U.S.C. § 2601, et seq. ("RESPA"), Pennsylvania's Loan Interest

1. The court has jurisdiction over this matter pursuant to 28 U.S.C. § 1334, § 157(a). This is a core proceeding pursuant to 28 U.S.C. § 157(b)(1) and (b)(2)(A),(B),(K) and (O).

2. The second Assignment is not dated, but recites that the mortgage was recorded on September 12, 1997, so it appears that this second assignment occurred sometime after that date. In their answer, the Defendants admitted that Bankers Trust was the current holder of the mortgage, as trustee, and that

Delta filed a proof of claim in connection with the mortgage. See Defendants' Answers to ¶¶ 5 and 6 of Debtor's Complaint. According to the Defendants, the mortgage was "owned or being serviced by Delta" at the time the proof of claim was filed (i.e., on or about November 22, 2000), but is currently being serviced by Bankers Trust and Delta, through its attorney-in-fact, Ocwen Federal Bank, FSB. Defendant's Memorandum of Law, pp. 1–2.

and Protection Law, 41 Pa. Stat. § 502 (the "Usury Count"), and Pennsylvania's Unfair Trade Practices and Consumer Protection Law, 73 P.S. § 201–1 *et seq.* On February 22, 2002, the Debtor filed this Motion for Summary Judgment (the "Summary Judgment Motion"), together with a memorandum of law in support of the Summary Judgment Motion, on all but the Usury Count. On March 20, 2002, the Defendants filed a response and a memorandum of law in opposition to the Summary Judgment Motion. On April 11, 2002, the parties presented oral argument in support of their positions at a hearing before this Court.

For the reasons which follow, the Summary Judgment Motion will be denied as to Counts I and II, and granted, in part, as to Count IV.

### *LEGAL STANDARD*

Summary judgment is appropriate when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c), made applicable to this adversary proceeding by Fed. R. Bankr.P. 7056. In a motion for summary judgment, the moving party "always bears the initial responsibility of informing the … court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of fact." *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986).

Once the moving party has made a proper motion for summary judgment, the burden shifts to the non-moving party, pursuant to Rule 56(e), which states, "[w]hen a motion for summary judgment is made and supported as provided in this rule, an adverse party may not rest upon the mere allegations or denials of the adverse party's pleading, but the adverse party's response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial. If the adverse party does not so respond, summary judgment, if appropriate, shall be entered against the adverse party." Fed R. Civ. P. 56(e); *see also Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). The party opposing the motion "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita,* 475 U.S. at 586, 106 S.Ct. 1348.

Before a court will find that a dispute about a material fact is genuine, there must be sufficient evidence upon which a reasonable jury could return a verdict for the non-moving party. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). The court must view the facts and draw inferences in a light most favorable to the non-moving party. *Anderson,* 477 U.S. at 255, 106 S.Ct. at 2513–14. "[W]here the non-moving party's evidence contradicts the movant's, then the non-movant's must be taken as true." *Pastore v. Bell Tel. Co.,* 24 F.3d 508, 512 (3d Cir.1994). It is not the role of the judge to weigh the evidence or to evaluate its credibility, but to determine "whether there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 249, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

### *DISCUSSION*

1. *Count I–TILA and HOEPA Violations.*

A creditor in a consumer credit transaction, other than an open end credit plan, is

required to make certain disclosures under TILA before credit is extended. 15 U.S.C. § 1638(a), (b). The creditor must also provide additional disclosures for mortgages subject to HOEPA "not less than 3 business days prior to consummation of the transaction." 15 U.S.C. § 1639(b)(1).[3] The early disclosures required by HOEPA are set forth 12 C.F.R. § 226.32(c).[4]

In her Motion for Summary Judgment, the Debtor claims that Eagle failed to comply with the HOEPA disclosure requirements.[5] More specifically, the Debtor argues that, although she received a HOEPA disclosure statement more than three business days prior to the loan closing, the disclosure statement was insufficient because: (1) it did not disclose that the transaction included a balloon payment, (2) it disclosed a "note rate" in addition to the required annual percentage rate, and (3) it listed a "loan amount" that was greater than the amount that was actually financed. *See* Ex. A to Debtor's Mem. of Law.

(a) *The balloon payment.*

▮ First, the Debtor claims that the balloon payment should have been disclosed on the HOEPA disclosure state-

ment pursuant to 12 C.F.R. § 226.32(c)(3), which now provides, in part, as follows:

(c) Disclosures. In addition to other disclosures required by this part, in a mortgage subject to this section, the creditor shall disclose the following in conspicuous type size:

. . . .

(3) Regular payment; balloon payment. The amount of the regular monthly (or other periodic) payment and the amount of any balloon payment. The regular payment disclosed under this paragraph shall be treated as accurate if it is based on an amount borrowed that is deemed accurate and is disclosed under paragraph (c)(5) of this section.

12 C.F.R. § 226.32(c)(3)(2003). The prior version of 12 C.F.R. § 226.32(c)(3) provided:

(c) Disclosures. In addition to other disclosure required by this part, in a mortgage subject to this section the creditor shall disclose the following:

. . . .

(3) Regular payment. The amount of the regular monthly (or other periodic) payment.

---

**3.** The Debtor asserts that the Loan is subject to HOEPA under 15 U.S.C. § 1602(aa)(1)(B) because it is a mortgage loan in which the total points and fees charged, in addition to interest, exceed 8% of the loan amount. *See* Debtor's Mem. of Law, p. 4 n. 1. The Defendants deny this allegation of the Debtor's complaint; however, in their Memorandum of Law, they conceded "for purposes of this motion for summary judgment" that HOEPA applies to the loan transaction. *See* Defendant's Mem. of Law, p. 3.

**4.** Regulation Z, 12 C.F.R. Part 226 (1979) was promulgated by the Federal Reserve Board to implement the TILA. *See Smith v. Fidelity Consumer Discount Co.*, 898 F.2d 896, 898 (3d Cir.1990)("To implement TILA, Congress

'delegated expansive authority to the Federal Reserve Board to elaborate and expand the legal framework governing commerce in credit. . . .The Board exerted its responsibility by promulgating Regulation Z.' ") (citations omitted). The HOEPA early disclosure form is also known as a "Section 32 Form" because its requirements are located in section 32 of Regulation Z.

**5.** Although the Debtor's allegations address the conduct of Eagle, she sued Delta and Bankers Trust as assignees of the mortgage. Assignees of HOEPA mortgages are liable for claims that could be asserted against the original creditor of the mortgage. 15 U.S.C. § 1641(d).

12 C.F.R. § 226.32(c)(3)(1995). On March 6, 1997, the Federal Reserve Board published a Final Rule revising the official staff commentary to Regulation Z which, *inter alia,* added a paragraph to the commentary for § 226.32 advising that balloon payments must be disclosed on the HOEPA early disclosure statement. 62 Fed. Reg.10193, 10198 (March 6, 1997)(the "1997 Revisions"). Although the 1997 Revisions were effective on February 28, 1997, compliance was optional until October 1, 1997. *Id.* at 10193.[6] The Debtor's loan transaction occurred on July 16, 1997. The Debtor admits that, at the time of the subject loan transaction, § 226.32 did not specifically require disclosure of balloon payments.

The Debtor argues, however, that the 1997 Revisions did not replace any existing language in the statute or regulation regarding balloon payments and, therefore, the new paragraph added to the Official Staff Commentary for § 226.32 was not a change to the prior law, but a clarification of existing law. The Debtor also argues that the only reasonable interpretation of 12 C.F.R. § 226.32(c)(3) requires disclosure of a balloon payment because, otherwise, a consumer would be misled into believing that the regular monthly payments would fully amortize the loan. Debtor's Mem. of Law, p. 6.

To support her argument, the Debtor relies upon *Clay v. Johnson,* 264 F.3d 744, 749 (7th Cir.2001), in which the Seventh Circuit Court of Appeals determined that the final version of a comment adopted by the Federal Reserve Board for the Official Staff Commentary to Regulation Z noted that it was intended to interpret and clari-

fy a creditor's existing obligations under TILA and Regulation Z. *Clay,* 264 F.3d at 749. The final version had not been adopted at the time the loan at issue in *Clay* was made, and the parties disputed whether the comment could be applied retroactively. The *Clay* Court stated:

> If an agency promulgates a new rule that changes the substantive state of existing law, that rule is not retroactive unless Congress expressly authorized retroactive rulemaking and the agency clearly intended the rule to be retroactive.... However, a "rule simply clarifying an unsettled or confusing area of the law ... does not change the law, but restates what the law according to the agency is and has always been."... A clarifying rule, therefore, can be applied to the case at hand just as a judicial determination construing a statute can be applied to the case at hand....We give great deference to the promulgating agency's expressed intent as to whether its rule changes the law or merely clarifies it.

*Clay,* 264 F.3d at 749 (citations omitted). The 1997 Revisions applicable to this Loan do not include any language to suggest that the Board was clarifying existing law. Instead, the 1997 Revisions refer to the new paragraph about disclosure of balloon payments as "revisions and additions" to Paragraph 32(c)(3). 62 Fed.Reg. at 10198. Furthermore, the phased-in, rather than immediate, implementation of the 1997 Revisions suggests a lack of urgency in requiring the balloon payment disclosure. Finally, the Board's decision to add language to the Official Staff Commentary of

---

**6.** Official Staff Commentary issued by the Federal Reserve Board is "accorded the same deference" as the regulations. *Wright v. Mid–Penn Consumer Discount Company,* 133 B.R. 704, 708 (E.D.Pa.1991) *citing* Ralph J. Rohner, *The Law of Truth in Lending,* 2.01[2][c]

(1989). The requirement for disclosing balloon payments was later moved from the Official Staff Commentary into § 226.32(c)(3) itself, "to aid in compliance." 66 Fed.Reg. 65604, 65610 (December 20, 2001).

§ 226.32(c)(3) tends to negate the Debtor's argument that § 226.32(c)(3) is subject to only one reasonable interpretation. Accordingly, failure to include the balloon payment in the HOEPA disclosure form provided to the Debtor did not violate the requirements of TILA and Regulation Z, as they existed in July 1997.

(b) *The note rate.*

■ The Debtor next alleges that Eagle's disclosure of the Loan's "note rate" was impermissible as likely to cause confusion to a borrower. Beneath the required Annual Percentage Rate ("APR") and monthly payment disclosures, the HOEPA form stated: *"Note: The note rate of your loan is 13.99%. The annual percentage rate reflects the cost of any prepaid finance charges that may be included in your loan."* The APR and monthly payment disclosures, printed above the statement, appeared in regular type in an enumerated list.

■ The Defendants correctly argue that lenders are not prohibited from including additional information on disclosure forms. Section 1632(a) provides that the annual percentage rate and finance charge shall "be disclosed more conspicuously than other terms, data, or information provided in connection with a transaction...." 15 U.S.C. § 1632(a). Section 1632(b) further states that "[a]ny creditor or lessor may supply additional information or explanation with any disclosures required under parts D and E of this subchapter and, except as provided in sections 1637a(b)(3)[7] and 1638(b)(1)[8] of this title, under this part." 15 U.S.C. § 1632(b). The HOEPA disclosure requirements set forth in § 1639 are under the same subchapter and part [Part B–Credit Transactions] as section 1632.

This is not a situation in which the borrower was given information that directly contradicted other information, as in *In re Apaydin,* when the borrowers received both a notice advising them of their right to rescind with a form waiving that rescission right. *Apaydin v. Citibank Fed. Savings Bank (In re Apaydin),* 201 B.R. 716, 723 (Bankr.E.D.Pa.1996). *See also Rodash v. AIB Mortgage Co.,* 16 F.3d 1142, 1147 (11th Cir.1994)(same). Neither did the lender label two items identically. *See Varner v. Century Finance Co.,* 738 F.2d 1143, 1147–48 (11th Cir.1984)(Disclosure statement that labeled two different amounts as the "loan fee" was determined to be in violation of Regulation Z.)

Disclosure of the note rate, removed visually on the form from the APR and monthly payment amount, and accompanied by a simple explanation of what the APR denotes, does not rise to the level of confusion caused by the disclosure infractions described in the cases discussed above. The APR, appearing in the center of the disclosure document, is disclosed more conspicuously than is the note rate. Rather than serving to highlight the information, the display of the note rate and its juxtaposition to the APR explanation, fixes its subordinate role—as if the note rate is a footnote—on the disclosure document. *See Mason v. General Fin. Corp.,* 542 F.2d 1226, 1233 (4th Cir.1976)(Court determined that "equal billing" of the federal TILA disclosures and the state lending disclosures violated TILA and Regulation Z because it told the borrower "more than he needs to know and more than he can possibly understand.") The note rate does not contradict the APR, and both rates are

---

**7.** Section 1637a sets forth disclosure requirements for open end consumer credit plans secured by a consumer's principal dwelling.

**8.** Section 1638(b) sets forth the requirements for the typical TILA disclosures in a residential mortgage transaction.

clearly labeled. The intent of the disclosure requirement, to provide uniformity to assist consumers in comparison shopping, is not undermined, since the APR and the monthly payment are clearly and conspicuously disclosed on the form.

(c) *The loan amount.*

■ Finally, the Debtor argues that the "loan amount" of $44,250 on the HOEPA disclosure form contradicted the "amount financed" of $39,896.34 on the TILA form provided at closing, causing confusion. The loan amount set forth on the HOEPA disclosure statement is the principal amount of the balloon note signed by the Debtor. *See* Exhibit A to the Defendants' Mem. of Law. 12 C.F.R. § 226.32 does not require disclosure of the loan's principal amount, but, as discussed above, Eagle was not prohibited from providing additional information in the HOEPA disclosure form.

In *Smith v. Anderson*, 801 F.2d 661 (4th Cir.1986), the court concluded that the lender did not provide information in a confusing manner and did not violate TILA by stating different interest rates and principal amounts on the note and in the truth-in-lending statement. The *Smith* plaintiff argued that the principal amount in the note should have matched the "amount financed" in the TILA disclosure statement. However, the *Smith* Court noted that "amount financed" is a "term of art, defined by federal regulations" and concluded that the difference between the principal amount and the amount financed did not create a confusing inconsistency. *Id.* at 663. The Court wrote:

> Rather than being a deliberate attempt to deceive, ... [the lender's] disclosures in the truth-in-lending statement served to supplement the information provided in the note in the

uniform manner required by federal law, and to convey to the borrowers in understandable terms the true extent of their obligations.

*Smith,* 801 F.2d at 664. The same reasoning applies here to the difference between the loan amount on the HOEPA disclosure document and the "amount financed" on the TILA disclosure statement. Further, the Debtor received an itemization of the "amount financed" (i.e., the principal amount of the loan minus the prepaid finance charge) on the Good Faith Estimate Of Settlement Charges (*See* Exhibit 3 to Jones' Deposition), provided at settlement, along with the TILA disclosure form.

Eagle's HOEPA disclosure form included all required disclosures under 15 U.S.C. § 1639 and 12 C.F.R. § 226.32. For the reasons discussed above, Eagle's failure to disclose the balloon payment and inclusion of additional information (i.e., the note rate and loan amount) did not violate TILA and HOEPA as a matter of law. The Debtor's motion for summary judgment as to Count I will be denied.

2. *Count II–RESPA violations.*

■ In the Complaint, the Debtor alleges that her sister referred her to Anthony Jones, a mortgage loan broker, for assistance in obtaining a loan. Complaint, ¶ 8. Jones ultimately arranged for the Debtor to obtain the Loan from Eagle. *Id.* ¶ 9. At closing, Jones received a fee of $3,097.50. The Debtor argues that the broker fee paid to Jones was in fact an illegal kickback or referral fee from Eagle to Jones in violation of 12 U.S.C. § 2607(a) of RESPA. That section states:

> No person shall give and no person shall accept any fee, kickback or thing of value pursuant to any agreement or understanding, oral or otherwise, that business incident to or part of a real estate settlement service involving a federally

related mortgage loan shall be referred to any person.

12 U.S.C. § 2607(a).[9] There is no prohibition, however, against payment for services actually rendered. 12 U.S.C. § 2607(c).

The Debtor argues that the broker fee "was not based on a valid contract, was not in exchange for any services she contracted to pay for, and bore no reasonable relationship to the value of any 'services' the broker could be said to have provided" to the Debtor or Eagle. Debtor's Mem. of Law, p. 12. The Defendants dispute these allegations and argue that issues of material fact preclude summary judgment on Count II.

When considering similar issues regarding broker fees in the case *Newton v. United Co. Fin. Corp.*, 24 F.Supp.2d 444, 463–(E.D.Pa.1998), the Court looked at whether the fees were paid pursuant to a bona fide agreement between the borrower and the broker. *Newton*, 24 F.Supp.2d at 463–64. The Debtor, citing to her affidavit, claims that she never agreed to pay Jones a separate fee. Debtor's Mem. of Law, p. 14. The Debtor claims that any agreement regarding Jones' fee was made between Jones and Eagle. *Id.* To counter the Debtor's allegations, the Defendants presented a copy of a Mortgage Broker Fee Agreement between Jones and the Debtor dated July 16, 1997, which is the date of the Loan closing. Exhibit F to Defendants' Mem. of Law (the "Broker Agreement"). The Debtor, however, argues that the Broker Agreement is not valid because she did not agree to pay Jones for any services *prior to closing*. Whether the Debtor agreed to pay Jones for his services in connection with obtaining the Loan is an unresolved issue of material fact.[10]

Also important are the issues of whether Jones actually performed services for the Debtor and, if so, whether the fee charged for those services was "reasonably related" to the services performed. *See* Real Estate Settlement Procedures Act (RESPA) Statement of Policy 1999–1 Regarding Lender Payments to Mortgage Brokers, 64 Fed.Reg. 10080, 10084 (March 1, 1999) (the "1999 RESPA Policy"). *See also Newton*, 24 F.Supp.2d at 463 (E.D.Pa. 1998)(The Court concluded that a $700 broker fee was bona fide compensation for services rendered by the broker and the plaintiffs did not present any evidence that the amount of the fee was unreasonable).

For guidance on the issue of whether a broker performed actual services to justify his fee, the 1999 RESPA Policy, issued by the Department of Housing and Urban Development ("HUD"), discusses a 1995 letter from HUD to the Independent Bankers Association of America ("IBAA") which sets forth a two-part inquiry. 64 Fed.Reg. 10085. First, the IBAA letter identifies a non-exhaustive list of fourteen tasks usually performed by a mortgage broker and states that HUD generally would be satisfied that a broker performed

**9.** The mortgage is subject to section 2607 as a "federally related mortgage loan" within the meaning of 12 U.S.C. § 2602.

**10.** Both parties also cite to the transcript of Jones' deposition in support of their positions about whether the Debtor agreed to pay for Jones' services prior to closing—the Debtor focusing on Jones' testimony that he may not have advised the Debtor of the specific amount she would be charged, the Defendants focusing on Jones' testimony that he told the Debtor that his fee would be based upon a percentage of the loan, that percentage to be determined by "other factors." *See* Jones Deposition, attached as Exhibit G to the Debtor's Mem. of Law, p. 30 (the "Jones Deposition"). *See also* Debtor's Mem. of Law, p. 14; Defendants' Mem. of Law, pp. 9–10. This also underscores the existence of an outstanding factual issue.

adequate services in connection with the loan if the broker took the borrower's loan application information and performed at least five additional items on the list. 64 Fed.Reg. at 10085.[11]

Second, HUD would analyze a broker's "counseling type" services to ensure a broker was not merely steering a borrower to a particular lender. *Id.* HUD pointed out that it would be satisfied that meaningful counseling occurred if it found that the broker: (1) gave the borrower the opportunity to consider products from at least three different lenders; (2) would receive the same compensation regardless of which lender's products were ultimately selected; and (3) any payment for "counseling-type" services is reasonably related to the services performed and not based on the amount of loan business referred to a particular lender.

The Broker Agreement signed by the Debtor at closing sets forth five tasks for Jones to complete.[12] The Debtor admits that in addition to preparing the loan application, Jones ordered an appraisal, maintained contact with the borrower and lender, and attended the closing. The Defendants repeat the Debtor's list and add that Jones also may have negotiated a settlement of one of the Debtor's outstanding debts. Jones Deposition, p. 36–37. It appears that Jones performed actual services in connection with obtaining the Loan. However, whether Jones performed all of the tasks identified in the Broker Agreement or performed sufficient tasks to meet the guidelines established in the 1999 RESPA Policy is an unresolved issue of material fact.

Finally, the 1999 RESPA Policy states that "[t]he determinative test under RESPA is the relationship of the services, goods or facilities furnished to the total compensation received by the broker." 64 Fed.Reg. at 10085. When a payment to a broker is based on the value of business transacted, it is evidence of an agreement for the referral of business. 64 Fed.Reg. at 10086 n. 8. "[T]he excess over the mar-

---

11. The fourteen tasks listed in the 1999 RESPA Policy are: (a) taking information from the borrower and filling out the application; (b) analyzing the prospective borrower's income and debt and pre-qualifying the prospective borrower to determine the maximum mortgage that the prospective borrower can afford; (c) educating the prospective borrower in the home buying and financing process, advising the borrower about the different types of loan products available, and demonstrating how closing costs and monthly payments could vary under each product; (d) collecting financial information (tax returns, bank statements) and other related documents that are part of the application process; (e) initiating/ordering VOEs (verifications of employment) and VODs (verifications of deposit); (f) initiating/ordering requests for mortgage and other loan verifications; (g) initiating/ordering appraisals; (h) initiating/ordering inspections or engineering reports; (i) providing disclosures (truth in lending, good faith estimates, others) to the borrower; (j) assisting the borrower in understanding and clearing credit problems; (k) maintaining regular contact with the borrower, realtors, lender, between application and closing to appraise them of the status of the application and gather any additional information as needed; (*l*) ordering legal documents; (m) determining whether the property was located in a flood zone or ordering such service; and (n) participating in the loan closing. 64 Fed.Reg. at 10085.

12. The Broker Agreement states: "I will provide the following services on a best effort basis to help you secure financing for the above referenced property: (1) Mortgage programs—provide explanations and prequalifications. (2) Application completion assistance. (3) Obtain, review, explain, and, if necessary help correct, your credit report. (4) Obtain a written conditional approval from a bona-fide, financially sound lender for your loan. (5) Help you to meet the terms of the commitment that we obtain." Exhibit F to Defendants' Mem. of Law.

ket rate may be used as evidence of a compensated referral or an unearned fee in violation of [12 U.S.C. § 2607(a) or (b)] of RESPA." 64 Fed.Reg. at 10086. Here, the Debtor has not identified any portion of the pleadings or exhibits that demonstrate an absence of fact as to the reasonableness of the fee charged by Jones. No evidence has been presented regarding price structures and practices in similar transactions.[13] *Id.* Summary judgment will be denied on Count II.

### 3. *Count IV–Violations of state consumer protection laws.*

■ Count IV of the Debtor's complaint alleges that Eagle's and Jones' conduct in connection with the Loan transaction constituted an unfair or deceptive practice in violation of the Pennsylvania Unfair Trade Practices and Consumer Protection Law, 73 P.S. § 201–1 *et seq.* ("UDAP").[14] Section 201–3 of UDAP declares unlawful all "unfair or deceptive acts or practices," which are defined in Section 201–2(4). A person who purchases good or services primarily for personal, family or household purposes and thereby suffers an ascertainable loss of money or property as a result of the employment of an unfair or deceptive act or practice may bring a private action to recover actual damages. 73 P.S. § 201–9.2(a). A court may, in its discretion, award up to three times the actual damages sustained. *Id.* The Third Circuit Court of Appeals has concluded that the provisions of UDAP apply to protect consumers from deceptive acts or practices in

the residential mortgage industry. *Smith v. Commercial Banking Corp. (In re Smith),* 866 F.2d 576, 582 (3d Cir.1989).

The Debtor alleges that Eagle's and Jones' deceptive conduct fell within the following subsections of Section 201 2(4):

  (v) Representing that goods or services have ... benefits or qualities that they do not have ...;

  ....

  (xxi) Engaging in any other fraudulent or deceptive conduct which creates a likelihood of confusion or of misunderstanding.

73 P.S. § 201–2(4)(v), (xxi). The Debtor alleges that two acts, in particular, violated UDAP. First, the Debtor alleges that the payment of Jones' broker fee violated a provision in UDAP that covers certain sales contracts (73 P.S. § 201–7) and the Credit Services Act (73 P.S. § 2181 *et seq.*)(the "CSA") because Jones failed to give the Debtor a written broker agreement that included notice of her right to cancel the agreement as required by the foregoing sections of UDAP and the CSA. Second, the Debtor alleges that Jones and Eagle violated UDAP by misleading the Debtor into entering into a loan which contained terms that were wholly disadvantageous to her. The Defendants respond that (1) the state consumer protection laws regarding broker agreements cited by the Debtor do not apply to the Loan and, even if the laws were applicable, the lender can not be held liable for the broker's failure to comply with those

---

**13.** "In analyzing whether a particular payment or fee bears a reasonable relationship to the value of the goods or facilities actually furnished or services actually performed, HUD believes that payments must be commensurate with that amount normally charged for similar services, goods or facilities. This analysis requires careful consideration of fees paid in relation to price struc-

tures and practices in similar transactions and in similar markets." 64 Fed.Reg. at 10086.

**14.** This statute is frequently referred to as "UDAP" since it regulates "unfair and deceptive acts and practices." *See* 73 P.S. § 201–2(4); *In re Murray,* 239 B.R. 728, 729 (Bankr. E.D.Pa.1999).

laws; and (2) neither the broker nor the lender misled the Debtor about the terms of the Loan or, in the alternative, issues of material fact still exist regarding the type of financing sought by the Debtor, her reasons for requesting a loan, and her understanding of the loan terms.

a. *UDAP Section 201–7.*

■ The Debtor alleges that Eagle and Jones violated Section 201 7 of UDAP by failing to provide her with a timely written agreement about the broker fee which included notice of her right to cancel the agreement within three days. 73 P.S. § 201 7. Section 201–7 states:

> (v) Where good or services having a sale price of twenty-five dollars ($25) or more are sold or contracted to be sold to a buyer, as a result of, or in connection with, a contact with or call on the buyer or resident at his residence either in person or by telephone, that consumer may avoid the contract or sale by notifying, in writing, the seller within three full business days following the day on which the contract or sale was made and by returning or holding available for return to the seller, in its original condition, any merchandise received under the contract or sale.

73 P.S. § 201–7(a). This provision further requires that, at the time the contract is signed, the buyer must receive written notice of her right to cancel the transaction within three days. 73 P.S. § 201–7(b), (d).

The Defendants argue that the agreement between the Debtor and Jones does not fall within the terms of Section 201–7(a) because the agreement was not "as a result of, or in connection with, a contact with or call on the buyer or resident at his residence either in person or by telephone." [16] The Debtor, however, alleges that any agreement with Jones "resulted from a contact with [the Debtor] at her residence by telephone." [17] Debtor's Mem. of Law, p. 19. She cites to Jones' deposition in support of this allegation, in which he states that the contact started when he received a telephone call from the Debtor (*See* Jones' Deposition, p. 9) and argues that the door-to-door sales provision was "written broadly to encompass most consumer transactions that do not take place in a store or retail business." Debtor's Mem. of Law, p. 19. The Debtor does not allege that any further meetings or negotiations with Jones took place at her residence.

Even assuming that the Debtor contacted Jones from her residence (*see* n. 17, *supra*), this single contact, initiated by the buyer, is not enough to bring the contract within the door-to-door sales provision of Section 201–7. In *Saler v. Hurvitz (In re Saler)*, 84 B.R. 45 (Bankr.E.D.Pa.1988), the court rejected a debtor's argument that "the statute is broadly drawn and should embrace any transaction where either a 'contact with' or 'call' at the obligor's residence played any part in the transaction." In *Saler*, the Court held that an in-home appraisal, which was the only contact at the debtor's residence in connection with a mortgage loan, did not bring the transaction within Section 201–7, writing:

---

16. This provision is often referred to as the "door-to-door sales provision" of Section 201–7, even though it the language includes solicitations made by telephone.

17. There may be an issue of material fact concerning whether the Debtor made the initial telephone call to Jones from her residence. Although the Debtor alleges that this fact is not contested, the Defendants denied the relevant allegations in the Debtor's complaint (¶ 33) and there is nothing in Jones' deposition to indicate that the Debtor made the call from her residence.

However, in interpreting § 201–7, we must recognize that the breadth of its wording is meant to prevent the use of devices to circumvent its underlying intention to provide protection in a broad range of "door-to-door" sales. It is not meant to open up every transaction in which a seller of goods or services has any sort of contact at all with the buyer at his residence to the scope of § 201–7. If we adopted the Debtor's interpretation, practically every home sale transaction and refinancing, most of which would require an in-home appraisal as a condition for consummation, would be within the scope of § 201–7. Also, any home improvement contractor who surveyed the scene of his projected tasks would be within its scope, even if all of the documentation were honestly and carefully put forth and executed in a setting other than in the customer's home. We do not believe that the legislature could have possibly envisioned such frankly bizarre consequences to flow from the enactment of § 201–7.

*Saler,* 84 B.R. at 49. *See Lou Botti Construction v. Harbulak,* 760 A.2d 896, 898 (Pa.Super.2000)(stating that the *Saler* Court's interpretation of Section 201–7 was "instructive.")

The Court in *Commonwealth ex rel. Zimmerman v. Nickel,* 26 Pa. D. & C.3d 115, 1983 WL 286 (C.C.P. Mercer County, 1983), also declined to construe section 201–7 broadly, stating:

Plaintiff invites the court to broadly interpret the language of section 201–7 to include contracts preceded by a remote contact at the residence of the buyer by mail. This court declines that invitation. To adopt such an interpretation would grant the right of rescission under this act to every contract which ultimately resulted from advertising received in the home, be it by mail, newspaper, flyer or even though radio or television if plaintiff's logic were carried to its natural conclusion. Obviously, this could not have been the intent of the legislature in enacting section 201–7. Had they so intended, it could have easily been expressly set forth.

*Nickel,* 26 Pa. D. & C.3d at 125–126.

In *Burke v. Yingling,* 446 Pa.Super. 16, 666 A.2d 288 (1995), the Superior Court of Pennsylvania concluded that a sale of a custom audio/visual system for the buyer's home fell within the door-to-door sales provision of Section 201–7 because the plain language of the statute protects all buyers when the seller "makes a contact or call on the buyer at his residence." It is true that the plain language of the statute does not expressly exclude transactions "where the initial contact was made by the buyer." *Burke,* 446 Pa.Super. at 23, 666 A.2d at 292. But, in *Burke,* the seller "expressly admitted ... that Seller engaged in repeated contacts with Buyer at his home and that the sale of the audio visual system either resulted from or was consummated in connection with those contacts." *Burke,* 446 Pa.Super. at 21–22, 666 A.2d at 291.

Although the fact that the Debtor initiated the contact with Jones may not automatically exclude application of Section 201 7, the Debtor has not alleged that Jones contacted or called upon her at her residence. Here, the Debtor made a single initial telephone inquiry from her residence. All other contacts took place away from her home. Without evidence of other contacts—made by the seller—at the buyer's residence, a single contact by the buyer from his or her residence will not bring a transaction into the scope of Section 201–7. Accordingly, I conclude that the Debtor's allegations are not sufficient to place the Broker Agreement within the scope of Section 201–7.

### b. *The Credit Services Act.*

■ The Debtor next argues that the payment to Jones also violated the Credit Service Act, 73 P.S. § 2181 *et seq.*, (the "CSA"). The CSA is a Pennsylvania statute enacted in 1992 to regulate the conduct of "credit service organizations" and "loan brokers." *Barker v. Altegra Credit Co. (In re Barker)*, 251 B.R. 250, 260 (Bankr. E.D.Pa.2000). The Debtor claims that Jones is a "credit services organization," which is defined in Section 2182 of the CSA as follows:

**"Credit services organization."**

(1) A person who, with respect to the extension of credit by others, sells, provides or performs or represents that he or she can or will sell, provide or perform any of the following services in return for the payment of money or other valuable consideration:

   (i) Improving a buyer's credit, record, history or rating.

   (ii) Obtaining an extension of credit for a buyer.

   (iii) Providing advice or assistance to a buyer with regard to either subparagraph (i) or (ii).

73 P.S. § 2182. Subsection (2) of the definition of a credit services organization sets forth exceptions to the rule, but neither the Debtor nor the Defendants allege that any of the exceptions apply.

The CSA requires a credit services organization to provide buyers with an information sheet about its services and fees prior to execution of a contract or prior to receipt of any money. 73 P.S. §§ 2184, 2185. The Debtor alleges that Jones failed to do so. The CSA also requires a contract between a buyer and a credit services organization to include certain information, including notice of the buyer's right to cancel the contract within five days of signing. 73 P.S. § 2186. The Debtor alleges that the Broker Agreement did not contain the terms set forth in 73 P.S. § 2186; in particular, the Broker Agreement did not contain notice of her right to cancel.

The Defendants do not contest the Debtor's assertion that Jones is a credit service organization subject to the requirements of the CSA. Instead, the Defendants argue that Eagle cannot be held liable for Jones' violation of the CSA and, therefore, they cannot be liable as Eagle's assignees. In response, the Debtor argues that lenders can be held liable under UDAP for knowingly funding a transaction that violates a consumer protection law, relying upon *Heastie v. Community Bank of Greater Peoria*, 690 F.Supp. 716, 722 (N.D.Ill.1988) and *Iron and Glass Bank v. Franz*, 9 Pa. D & C 3d 419, 1978 WL 357 (CCP, Allegheny County 1978).

The Defendants argue that, even assuming the Debtor's statement of the law is correct, there is an issue of material fact as to whether Eagle funded the loan transaction, which included payment of Jones' fee, *knowing* that payment of the broker fee to Jones violated the CSA. However, at his deposition, Jones testified that Eagle prepared the Broker Agreement and had the Debtor sign the agreement at settlement. Jones Deposition, p. 46–47. Therefore, Eagle knew or should have known of the contract's contents and deficiencies.

In responding to the Debtor's Summary Judgment Motion, the Defendants "... may not rest upon the mere allegations or denials of the adverse party's pleading, but must, by affidavits or as otherwise, set forth specific facts showing that there is a genuine issue for trial." Fed R. Civ. P. 56(e). The Defendants "... must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita*, 475 U.S. at 586, 106 S.Ct.

1348. Their argument that an issue of fact still exists because no one from Eagle has been deposed or offered testimony is not sufficient to satisfy their burden in responding to the Debtor's Summary Judgment Motion.

■■■ In this case, Jones falls within the CSA's definition of a credit services organization because he assisted the Debtor in obtaining an extension of credit from a third party lender in return for compensation. Therefore, Jones should have provided the Debtor with an information sheet that complied with 73 P.S. §§ 2184 and 2185, and the Broker Agreement should have contained the terms required by 73 P.S. § 2186. The fee agreement, however, did not include notice of a right to cancel the agreement. Because Eagle prepared the deficient Broker Agreement and presented it to the Debtor to sign at settlement, Eagle, itself, violated the CSA.[18]

The CSA expressly provides that a violation of the CSA shall be deemed to be a violation of UDAP. 73 P.S. § 2190(a). Under HOEPA, the Defendants are subject to any claims that could have been asserted against Eagle, the original lender. 15 U.S.C. § 1641(d). Accordingly, summary judgment will be granted in favor of the Debtor on her claim against the Defendants based upon UDAP and the CSA.

c. *UDAP Section 201-2(4).*

■■■ The Debtor argues that Jones and Eagle violated UDAP by misleading her into entering into a loan which contained terms that were wholly disadvantageous to her. In particular, she alleges that they did not advise her sufficiently about the balloon payment, the refinancing of her low interest mortgages, and the broker fee. She claims she was not aware of many of these terms until the Loan closing, although they should have been disclosed or discussed prior to closing.[19] Therefore, she asserts that Jones' and Eagles' conduct constituted "unfair and deceptive acts or practices" as defined in 73 P.S. § 201–2(4) by "representing that good or services have ... benefits or qualities that they do not have" (§ 201–2(4)(v)) and "engaging in ... fraudulent or deceptive conduct which creates a likelihood of confusion or misunderstanding" (§ 201–2(4)(xxi)).

The Debtor argues that her case is similar to *Barker, supra,* in which the broker was held to have violated § 201 2(4)(xxi) by failing to disclose the detrimental effect of replacing a loan with a 9% interest rate with a loan with a 17.99% rate; failing to advise the debtor that the loan amount was $19,500 when the debtor requested a loan for only $10,000; and failing to adequately disclose the balloon payment.[20] *Barker,* 251 B.R. at 261–62. However, the *Barker* case differs from the one at bar in several respects. After trial, the *Barker* court found the debtor's testimony credible that she never requested refinancing her other obligations. *Barker,* 251 B.R. at 255.

---

**18.** Therefore, there is no need to determine whether the *Iron and Glass Bank* decision is applicable to this case.

**19.** The Debtor claims that Eagle should have provided her with the good faith estimate of settlement costs three days after her initial application. 24 C.F.R. § 3500.7. Also, as discussed previously, she argues that the balloon payment should have been disclosed in the HOEPA disclosure form (12 C.F.R. § 226.32) and the broker fee should have been ex-

plained in an information sheet (73 P.S. § 2184).

**20.** In *Barker,* the broker failed to "adequately disclose to the uneducated debtor that executing a Balloon Note would result in a final large lump sum payment;" and failed "to disclose or estimate the amount of the lump sum payment in the Balloon Note." *Barker,* 251 B.R. at 261–62.

Here, what the Debtor requested remains a genuine issue of material fact, since Jones testified that she asked to consolidate and pay off other debts. *Compare* Debtor's Affidavit, ¶ 3, *with* Deposition pp. 10, 17, 18, 48. In *Barker,* the broker did not advise the debtor of a balloon payment, which was not disclosed on any documentation received by the debtor. *Barker,* 251 B.R. at 258. Here, the Debtor does not allege that she never realized there was a balloon payment, just that she "did not find out about this feature until the loan closing." Debtor's Affidavit ¶ 4. The broker in *Barker* also held himself out as having expertise in the mortgage industry, thus was found to have committed a material misrepresentation when he failed to advise the debtor of the detrimental nature of the loan transaction. *Barker,* 251 B.R. at 258. In this case, the Debtor did not allege a basis for Jones owing a fiduciary duty, or allege any misrepresentation of what services he would perform or that the Debtor was an unsophisticated borrower.

The Debtor also suggests that the UDAP violations can be inferred from the "gross or subtle unfairness of a loan's transaction's provisions as they affect the borrower." Debtor's Mem. of Law, p. 24. The Debtor cites to *Besta v. Beneficial Loan Co. of Iowa,* 855 F.2d 532, 536 (8th Cir.1988) for support of her position that a loan can be deemed unfair "if no reasonable person, being apprised fully of the financing terms would have accepted them." Debtor's Mem. of Law, p. 24. The *Besta* Court, however, did not infer unfairness from reviewing the loan terms, but examined the facts surrounding the broker's and borrower's conduct in making the loan and held that the broker's failure to advise the borrower of better repayment alternatives "deprived her of fair notice and amounted to unfair surprise,"

thereby violating the Iowa Consumer Credit Code. *Besta,* 855 F.2d at 536.

The Defendants respond to the Debtor's UDAP claim by arguing that Jones and Eagle did not mislead the Debtor as to the terms of the Loan. They argue that the Debtor was made aware of the balloon payment at closing by the TILA Disclosure Statement and due to the fact that the note was clearly entitled "Balloon Note." [21] They also cite to Jones' deposition, in which he testified that he reviewed the loan preapproval form with her. Jones Deposition, p. 27.

The Defendants also argue that the Debtor was not misled into refinancing her low interest loans, because Jones testified that the refinancing was done on her request. Jones Deposition, pp. 67–68. Jones' testimony also indicates that the Debtor was in default on her payments and sought the Loan, at least in part, to "get caught up." *Id.* Jones also stated that the interest rate was the best he could get at that time for the Debtor under the stated income loan program, and that he made the Debtor aware of the rate and that she had no problem with it. Jones Deposition, pp. 16–17.

Though the terms of the Loan seem harsh, the outstanding issues of material fact regarding the type and amount of financing sought by the Debtor and whether the Loan terms were sufficiently explained to the Debtor prevent entry of summary judgment on this count.

In summary, the Debtor's Summary Judgment Motion with respect to Count IV is resolved as follows:

(i) *Claims under 73 P.S. § 201–7:* I conclude that 73 P.S. § 201–7 is not applicable to this transaction and,

---

**21.** However, the Balloon Note does not state the amount of the final balloon payment.

therefore, summary judgment is denied;

(ii) *Claims under 73 P.S. §§ 2181 et seq.:* I conclude that the Debtor is entitled to summary judgment on her CSA claim.

(iii) *Claims under 73 PS § 201–2(4)(v), (xxi):* I conclude that issues of material fact prevent summary judgment on these claims.

An appropriate order follows.

## ORDER

**AND NOW,** this 25th day of March, 2003, upon consideration of the Motion for Summary Judgment by Helen Lewis (the "Debtor"), the memoranda of law submitted by both parties, and the April 11, 2002 hearing, and, for the reasons set forth in the accompanying Memorandum Opinion,

**AND** having concluded that:

a. the Debtor is not entitled to summary judgment on Count I as a matter of law;

b. the Debtor is not entitled to summary judgment on Count II as genuine issues of material fact exist;

c. the Debtor is not entitled to summary judgment on her 73 P.S. § 201–7 claim under Count IV as a matter of law;

d. the Debtor is not entitled to summary judgment on her 73 PS § 201–2(4)(v), (xxi) claims under Count IV as genuine issues of material fact exist; and

e. the Debtor is entitled to summary judgment on her 73 P.S. §§ 2182–2188 claim under Count IV;

it is hereby **ORDERED** that the Debtor's Motion for Summary Judgment is **DENIED** as to Counts I and II, but **GRANTED,** in part, as to Count IV, as described above.

A pretrial conference will be held on **April 10, 2003 at 10:00 a.m.** in Bankruptcy Courtroom No. 1, Robert N.C. Nix Federal Building & Courthouse, 900 Market Street, 2nd Floor, Philadelphia, Pennsylvania, at which time and place counsel shall be prepared to address any remaining pretrial needs, which issues, including those of damages, remain for trial, and to set a trial date.